T.C. Memo. 1996-159


UNITED STATES TAX COURT


AMOCO CORPORATION (Formerly STANDARD OIL COMPANY (INDIANA))
AND AFFILIATED CORPORATIONS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 20471-92.                    Filed March 28, 1996.


        S, a subsidiary of P, entered into a concession
agreement with E, an entity owned and controlled by the
Egyptian Government.  Under the agreement, which had
the force of law, E was responsible for the payment of
S's Egyptian income tax liability.  For the years in
issue, E took a credit against its own tax liability
for the amount of taxes paid on behalf of S.  The
Egyptian Tax Department determined that E was not
entitled to a credit and was allowed only to deduct
such payments from its taxable income.  It assessed
back taxes against E for a portion of the years in
issue.  Collection was foreclosed by the running of the
Egyptian statutory period of limitations.  <u>Held</u>, E was
not authorized to credit Egyptian taxes paid on behalf
of S against its income tax liability.  <u>Held, further</u>,
there was no refund of Egyptian taxes to or for the
account of P.  <u>Held, further</u>, E should be included in
the term "foreign country" for purposes of sec. 901,

I.R.C., and the regulations thereunder, including Example (3) of sec. 1.901-2(f)(2)(ii), Income Tax Regs. <u>Held, further</u>, there was no indirect subsidy to P with respect to E's credit practice. <u>Held, further</u>, the requirements of foreign tax creditability under secs. 901-908, I.R.C., have been satisfied with respect to Egyptian income taxes paid on behalf of S by E.

<u>Robert L. Moore, II</u>, <u>Jay L. Carlson</u>, <u>Emmett B. Lewis</u>, <u>J. Bradford Anwyll</u>, <u>Kevin L. Kenworthy</u>, <u>Laura G. Ferguson</u>, and <u>James J. Lenahan</u>, for petitioner.

<u>William G. Merkle</u>, <u>Cynthia J. Mattson</u>, <u>William B. Lowrance</u>, <u>Paul S. Manning</u>, <u>Michael J. Calabrese</u>, <u>Jan E. Lamartine</u>, <u>Bettie N. Ricca</u>, and <u>Joan M. Thomsen</u>, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

TANNENWALD, <u>Judge</u>: Respondent determined deficiencies in petitioner's 1980, 1981, and 1982 Federal income taxes in the amounts of $109,618,203, $200,848,534, and $155,776,311, respectively. The issue for decision is whether petitioner is entitled, under section 901,[1] to foreign tax credits for Egyptian income taxes purportedly paid or accrued for the years 1979-1982.[2]

---

[1] All statutory references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] In the petition, petitioner affirmatively claimed additional depletion deductions in the amounts of $738,084, $1,069,353, and $1,273,498, for 1980, 1981, and 1982, respectively, as well as reductions of petitioner's dividend income for 1980 and 1982 in

(continued...)

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated herein by this reference.

Amoco Corporation and Amoco Egypt

Petitioner Amoco Corporation (formerly Standard Oil Company (Indiana)) (hereinafter referred to as Amoco or petitioner) is an Indiana corporation with its principal place of business in Chicago, Illinois. Amoco and its affiliated corporations are engaged in the business of exploring for, producing, refining and marketing crude oil and petroleum products in the United States and other countries around the world. Amoco timely filed consolidated income tax returns on behalf of its affiliated group for the 1979, 1980, 1981, and 1982 tax years.

Amoco Egypt Oil Company (Amoco Egypt), is a Delaware corporation and a member of petitioner's affiliated group. It is engaged in the business of petroleum exploration and production within the Arab Republic of Egypt (ARE) (formerly the United Arab Republic). Amoco Egypt has explored for and produced crude oil and natural gas in ARE since the 1960's pursuant to concession agreements entered into with the ARE and the Egyptian General Petroleum Corporation.

-----

[2](...continued)
the amounts of $1,847,461, and $6,528,665, respectively. These issues have not yet been scheduled for trial.

Egyptian General Petroleum Corporation

The Egyptian General Petroleum Corporation is a legal entity first created by Egyptian Law No. 167 of 1958. Pursuant to Egyptian Law No. 20 of 1976, the powers, functions, and obligations of EGPC were assumed by a new legal entity also known as the Egyptian General Petroleum Corporation (both entities are hereinafter referred to as EGPC). EGPC is subject to Egyptian income tax. Further facts in respect of EGPC are set forth and discussed below, infra pp. 82-83.

Gulf of Suez Petroleum Company

The Gulf of Suez Petroleum Company (GUPCO) was formed by Amoco Egypt and EGPC pursuant to the 1964 Gulf of Suez Concession Agreement. GUPCO was later designated as the operating company for all operations pursuant to the merged concession agreement discussed below. GUPCO has a board of directors consisting of eight members, four of whom are designated by Amoco Egypt and the other four by EGPC. The chairman of the board is designated by EGPC.

Government Structure for Egyptian Tax Administration

The Egyptian Tax Department (ETD) is a department of the Finance Ministry responsible for the assessment and collection of taxes.[3]

_____

[3] Egyptian Law No. 14 of 1939 provides that an annual tax is established, "on the profits from professions and commercial, industrial, and artisan operations, including mining and other
                                                        (continued...)

Egyptian law requires that the ETD notify corporate taxpayers by certified mail of any adjustments to its tax declaration. The notice, a Form 18, must show the elements and amount of the proposed tax assessment and offer the taxpayer an opportunity to respond. The taxpayer may dispute the tax adjustments contained in the Form 18 within 30 days of its issuance. If an Egyptian corporate taxpayer agrees with the adjustments to its tax declaration, the tax is due and the subsequent assessment is final. Corporate Tax Form 19 is a notice of tax assessment and is issued if the corporation fails to respond to or disputes Form 18. The assessment pursuant to Form 19 may be appealed to the Internal Committee.

In the case of fraud on the part of the taxpayer, the ETD may make an additional assessment, using a Form 20. In all instances, the ETD may correct material or calculating errors.

If a dispute cannot be resolved by the Internal Committee, it is referred to the Refute Committee for appeal. EGPC is entitled to appeal a decision of the Refute Committee to the Egyptian State Council.

---

[3](...continued)
concessions and undertakings, with no exceptions other than those designated by law." The tax applies to economic units subsidiary to the public establishments and public authorities.

Amoco Egypt Tax Returns, Payments, Receipts

Amoco Egypt has filed annual income tax returns with the ETD from 1964 through 1992. For the period 1964 through June 30, 1975, Amoco Egypt paid its income taxes directly to the ETD.

For the period July 1, 1975, through December 31, 1992, EGPC paid Amoco Egypt's Egyptian income taxes in Egyptian pounds to the ETD. The ETD issued official receipts reflecting the income tax payments made by EGPC in the name of and on behalf of Amoco Egypt. The ETD typically delivered the receipts to EGPC, which in turn delivered them to Amoco Egypt. EGPC's payments of Amoco Egypt's income taxes were posted by ETD in its Amoco Egypt tax file (No. 440/4). None of EGPC's tax payments on behalf of Amoco Egypt for Amoco Egypt's 1979 to 1982 tax years were posted to EGPC's tax file (No. 440/6).

Amoco Egypt's annual tax returns were audited by the Petroleum Section of the Department of Tax on Joint Stock Companies within the ETD.

Amoco Egypt dealt directly with the ETD in connection with the department audits of its Egyptian income tax returns and disputes arising out of those audits.

EGPC's Tax Treatment of Amoco Egypt's Taxes

EGPC is required by law to file annual income tax returns. EGPC was a calendar year taxpayer for years ending before January 1, 1980. Thereafter, EGPC became a June 30 fiscal year

taxpayer, with its first fiscal year for the short period ending June 30, 1980.

EGPC's tax payments of its own tax liability are posted to EGPC's tax file (No. 440/6) by the ETD. EGPC's tax returns are audited by the Petroleum Section of the Department of Tax on Joint Stock Companies within the ETD.

On EGPC's Egyptian income tax returns for years prior to its taxable year ended June 30, 1993, EGPC credited royalty payments and income taxes paid on behalf of its foreign partners against its own income tax liabilities.

For the 1975 to 1980 tax years, ETD did not challenge the credit taken by EGPC against its tax liability for taxes paid on behalf of foreign partners, including Amoco Egypt. See infra pp. 42-46 for subsequent action by the ETD.

Egyptian Petroleum Concession Agreements - General Principles

Under Egyptian law and the Egyptian constitution, the ARE owns all that country's natural resources. Rules and procedures for granting concessions relating to the exploitation of the ARE's natural resources are established by law. The Ministry of Petroleum and Mineral Resources (formerly known as the Ministry of Industry, Petroleum and Mineral Wealth) (both hereinafter referred to as the Petroleum Ministry) whose top executive is the Minister of Petroleum is part of the executive branch of the

Egyptian Government with responsibility for management of the ARE's mineral resources.

The Egyptian Government authorizes petroleum exploration and development through concessions granted to EGPC or jointly to EGPC and a private oil company, such as Amoco Egypt. The procedure for entering into a concession agreement begins with a negotiation between EGPC and the private oil company as to the terms of the agreement. An agreement in English is initialed by the parties, indicating preliminary approval. The English text is then translated into an Arabic text, which is then initialed by the parties and the translators. Following approval by the EGPC board of directors and the Minister of Petroleum, the English text is signed by EGPC and the private oil company. Review and approval is then made by various government councils and committees. Among the government entities, the Egyptian State Council and the Council of Ministers conduct in-depth reviews and analyses of concession agreements where the terms of such agreements are presented to them for the first time. If an identical provision of another concession agreement is submitted, the committees rely upon the previous reviews. A law is then passed and signed by the president of the ARE authorizing the Minister of Petroleum to enter into the concession agreement on behalf of the Egyptian Government. The Minister of Petroleum and

the private oil company then sign the English and Arabic versions of the agreement, marking the effective date.

Once the English text of the agreement has been signed by EGPC and the private oil company, the oil company may request permission from EGPC to commence operations, prior to the effective date.

Amoco Egypt's 50/50 Income-Sharing Agreements

During the 1960's, the ARE, EGPC, and Amoco Egypt entered into three concession agreements (the 50/50 agreements): The Western Desert Concession Agreement in October 1963, the Gulf of Suez Concession Agreement in February 1964, and the Western Desert and Nile Valley Concession Agreement in September 1969. Under the 50/50 agreements, Amoco Egypt and EGPC each had 50-percent interests in concessions entitling them to explore for and produce petroleum in specified areas. Amoco Egypt was required to fund the exploration costs until a commercial discovery was established or until a certain amount of money had been expended on exploration efforts. Thereafter, Amoco Egypt and EGPC shared equally the costs of exploration and production, as well as sharing the crude oil produced in each concession area. Under the 50/50 agreements, EGPC and Amoco Egypt each paid royalties to the ARE on their respective shares of production. EGPC and Amoco Egypt each paid Egyptian income taxes on their respective income from each concession agreement.

In addition to Egyptian income taxes, EGPC and Amoco Egypt were each subject to an additional amount or "surtax" under the 50/50 agreements designed to assure that the ARE received 50 percent of each party's respective net profits. If the amount otherwise paid to the ARE, in the form of royalties, income taxes, and other payments, was less than 50 percent of net profits, Amoco Egypt and EGPC were required to pay to the ARE such difference by way of the surtax, to make the total of all payments equal to 50 percent of total net profits. If the total amount otherwise paid to the ARE exceeded 50 percent of net profits, Amoco Egypt and EGPC were exonerated and relieved from any obligation with respect to the excess, or could elect to credit such excess against future obligations to the Government.

In February 1965, Amoco Egypt's exploration efforts in the Gulf of Suez, pursuant to the Gulf of Suez concession agreement, resulted in the discovery of the El Morgan field. Production from the El Morgan field, the largest oil find in the ARE to date, began in February 1967. In the years after the discovery of the El Morgan field, Amoco Egypt made additional petroleum discoveries under its 50/50 concession agreements.

Shift to Production-Sharing Format

In 1970, the ARE and EGPC entered into a concession agreement with a Japanese corporation, the North Sumatra Oil

Development Cooperation Co. (Nosodeco), following a production sharing format.  The Nosodeco agreement provided:

> Income tax of NOSODECO in the [A.R.E.] to the Government shall be borne and paid by EGPC. EGPC shall present to NOSODECO the document evidencing such payment of tax. Income taxation outside [A.R.E.] shall not be borne by EGPC.

There was no provision dealing with the calculation of EGPC's taxes.

Since 1970, all new Egyptian concession agreements, including those to which Amoco Egypt is a party, have used the production sharing format, rather than the 50/50 income-sharing format.

Under a typical Egyptian production sharing agreement, EGPC holds the concession to explore for and produce petroleum.  A foreign oil company, as contractor, bears the cost of all exploration, development, and production activities in return for a negotiated share of production.  Some percentage of the oil produced in any year is allotted to the contractor for the recovery of costs.  The remaining oil production is shared by EGPC and the contractor in agreed percentages.

In contrast to the 50/50 agreements, under the production sharing format, EGPC bears the entire royalty obligation and pays the royalty out of its share of production.  Under the production sharing format, the foreign entity remains subject to Egyptian income tax, but EGPC assumes the obligation to pay the tax.

Esso and Mobil Production Sharing Agreements

In early 1973, Esso Middle East (Esso), a division of Exxon Corporation, began negotiations with EGPC to obtain an Egyptian concession agreement. Negotiations were conducted in English and draft agreements were prepared in English.

In the Esso negotiations, EGPC was represented by EGPC chairman (and later Minister of Petroleum) Ahmed Hilal, his successor as EGPC chairman, Ramzy El Leithy, Agreements Department Manager Ibrahim Radwan (I. Radwan), Accountant Ahmed Radwan (A. Radwan), Legal Counsel Ahmed Mansour, and Tax Advisor Gamal Eshmawi. Leithy served as EGPC chairman from April 1973 until 1980. Negotiations began before Leithy became chairman, although Leithy was head of the negotiating team when Article III(f)(6), see infra p. 14, was added to the agreement. Mansour and A. Radwan represented EGPC at most negotiation meetings, but went to Leithy with any problems. Mansour and A. Radwan were on an EGPC "small committee" responsible for reviewing the Esso agreement.

In the negotiations, Esso was represented by Frank H. Mefferd, W. D. Kruger, C. Hedlund, A. T. Gibbon, B. G. Agnew, C. B. Corley, and Alfons Sadek.

In February 1973, EGPC began the negotiations by using the Nosodeco production sharing agreement as a proposed model for the Esso agreement. It was intended that EGPC bear taxes and

royalties on behalf of Esso.  The proposed model provided that Esso "shall be exempted from the Income tax in the A.R.E."

In March 1973, Esso submitted proposed modifications to the agreement, including modifications to the tax provisions to make clear that Esso was liable for Egyptian income taxes.  Esso also proposed language describing the calculation of Esso's taxable income for Egyptian income tax purposes and stated that EGPC would pay Esso's taxes out of EGPC's share of crude oil and provide Esso with official receipts evidencing payment of Esso's taxes.  Neither the EGPC model agreement given to Esso nor the revised draft agreement Esso presented to EGPC contained any reference as to how EGPC's taxes would be computed.

In late March, a revised proposal was submitted by Esso, including both English and Arabic versions.  Neither version had a provision pertaining to the computation of EGPC's taxes.

On April 3, 1973, EGPC responded to the revised proposal by complaining that it would have nothing left after paying royalties, Esso's taxes, and its own tax liability, and asked Esso to accept a smaller share of production.

Esso determined that EGPC had not deducted taxes paid on behalf of Esso in its sample calculations and on April 6, 1973, informed EGPC that "this tax amount would be deductible in calculating EGPC's taxable income."  Further, "Thus with royalty expensed, EGPC would have a net income * * * after paying

Egyptian income tax." By this, Esso meant that EGPC should deduct from EGPC's taxable income taxes paid on Esso's behalf and royalties paid. It was also suggested to EGPC, although not pursued, that its profits would increase if royalty expenses were credited against tax.

In subsequent meetings with Esso negotiators, EGPC indicated uncertainty about whether the ETD would permit EGPC, in computing its taxable income, to deduct royalties and the taxes paid on behalf of Esso pursuant to the proposed production sharing agreement. The tax provisions were important to reaching a final Esso agreement. Following a meeting among Mefferd, Kruger, and Agnew for Esso, and I. Radwan, Mansour, and Eshmawi for EGPC, the following Article III(f)(6) was added, at EGPC's request, to the production sharing agreement:

> In calculating its A.R.E. Income Taxes, EGPC shall be entitled to deduct all royalties paid by EGPC to the A.R.E. Government and the A.R.E. Taxes of ESSO paid by EGPC on ESSO's behalf.

Esso and EGPC initialed an agreement in English on May 19, 1973. The agreement was not binding on either party until a law authorizing the Minister of Petroleum to enter into the agreement was issued and published in the Egyptian Official Gazette. Between May and early August 1973, Esso's Mefferd and Nabih Doss, a lawyer for an Esso marketing affiliate in Egypt, worked with EGPC's Mansour and Mongui El Rakshy, general counsel of General

Petroleum Corporation (GPC), on finalizing the Arabic version of the Esso agreement for submission to the State Council. Mefferd and Doss worked on the first draft of the Arabic version together in Egypt, in which Article III(f)(6) of such draft the word "minha" (meaning "therefrom"), see infra p. 23, does not appear. Mefferd then returned to Houston, leaving Doss to review the Arabic version with Rakshy representing EGPC. Doss communicated changes to Mefferd by telex, but assured Mefferd that no substantive changes had been made. Mefferd did not notice that the word "minha" appeared after the word "deduct" in Article III(f)(6) of the final Arabic version he reviewed.

The first step for obtaining approval of the Esso agreement involved EGPC's submitting it to the State Council. Mansour was the only EGPC lawyer presenting concession agreements to the State Council on EGPC's behalf.

Also in 1973, the ARE and EGPC entered into a concession agreement with Mobil Exploration Egypt, Inc. (Mobil). Negotiations for a production sharing agreement occurred simultaneously with the Esso negotiations. On May 10, 1973, an agreement was initialed in English on behalf of Mobil and EGPC. At EGPC's request, the Mobil agreement included Article III(g), identical to Article III(f)(6) of the Esso agreement. Mobil contemplated, by Article III(g), that EGPC would be entitled to deduct royalties paid to the Egyptian Government, and Egyptian

taxes paid by EGPC on behalf of Mobil, from its, EGPC's, taxable income.

Egyptian Law No. 107 of 1973 and Law No. 108 of 1973, authorizing the Minister of Petroleum to enter into the Mobil and Esso agreements, respectively, were promulgated by presidential decree.  Both laws, and the respective agreements, in both English and Arabic, were published in the Egyptian Official Gazette on October 4, 1973.  The Arabic versions of Article III(g) of the Mobil agreement and Article III(f)(6) of the Esso agreement both include the term "minha" after the word for "deduct".

## 1974 Amoco Egypt Production Sharing Agreements

In 1974, Amoco Egypt entered into three Egyptian production sharing agreements: the South Gharib, South Ghara Marine, and South Belayim Marine Concession Agreements.  The 1974 Amoco agreements were patterned after prior Egyptian production sharing agreements.  The tax provisions of the agreements were not the subject of any negotiation.

Article III(f)(6) of the 1973 Esso agreement served as a model for the provisions in the 1974 Amoco agreements governing EGPC's tax treatment of its tax payments on behalf of Amoco Egypt.

1976 MCA

At EGPC's request, in early 1975, EGPC and Amoco Egypt began preliminary discussions regarding the conversion of the three existing 50/50 agreements into a single production sharing agreement that came to be known as the merged concession agreement or MCA.[4] With respect to EGPC and the ARE, the compelling force for the new agreement was the rapid worldwide increase in oil prices that had created unanticipated profits for Amoco Egypt under the 50/50 agreements and thus a desire by EGPC and the ARE to modify the profit split, as well as a desire to adopt the production sharing format being used in the Arab community.

By letter dated March 3, 1975, EGPC formally requested that Amoco Egypt begin negotiating the terms of a production sharing agreement that would replace the 50/50 agreements. EGPC required that the new agreement follow the production sharing format; Amoco Egypt did not have the option of remaining with the 50/50 or "participation" agreement format.

---

[4] The 50/50 agreements are not to be confused with the 1974 production sharing agreements that were not replaced by the MCA. These production agreements have not been dealt with separately by the parties. To the extent that they may be involved in the years before us (as to which the record is unclear), our conclusions in respect of the issues arising out the MCA will be applicable.

Leithy, EGPC chairman, was the chief negotiator for EGPC for the negotiation of the MCA, as well as representing the interests of the Egyptian Government. Other members of the EGPC negotiating team included Mansour, its legal counsel, I. Radwan, and A. Radwan, its accountant.

Ross W. Craig, president of Amoco Egypt from 1971 to 1977, was the lead negotiator for Amoco Egypt. Other members of Amoco Egypt's negotiating team included attorneys Quentin Swiger and A. T. Richey from the tax department, attorneys Thomas James, John Rosshirt, and Egyptian attorney Ahmed Chiati from the law department, and economist James Bock from the planning and economics department.

The MCA negotiations generally consisted of one-on-one negotiations between Craig and Leithy. The negotiations were conducted in English, and drafts of the MCA were prepared in English.

Initially, a draft of the MCA prepared for Amoco Egypt proposed that EGPC be entitled to a tax credit for royalties paid to the Egyptian Government. This idea was quickly rejected by Craig and was never proposed to EGPC.

In working out the terms of the MCA, the parties used EGPC's prior production sharing agreements as models.

In the course of negotiations, Amoco was concerned with the creditability of Amoco Egypt's Egyptian income taxes for U.S. tax

purposes. Amoco Egypt initially proposed that it pay its own Egyptian income taxes out of its share of the oil. EGPC rejected this proposal, primarily because, among other things, the arrangements under the prior agreements offered EGPC the opportunity to obtain the foreign exchange benefit of obtaining dollars for oil and paying Amoco Egypt's taxes in local Egyptian currency. At EGPC's insistence, the tax provisions of the 1973 Esso agreement were used as the model for the tax provisions of the MCA.

In a letter dated April 22, 1975, Amoco Egypt responded to EGPC's March 3, 1975, request for negotiations and outlined the essential terms of an agreement, one of which was that "AMOCO's income-tax liability, grossed up, would be paid out of EGPC's 80 per cent share of profit oil." Leithy reviewed the April 22, 1975, letter and initialed the English text concerning Amoco Egypt's proposal regarding its taxes.

In an August 4, 1975, letter from Craig to Leithy, Craig summarized Amoco Egypt's understanding of EGPC's position with respect to certain matters, including that Amoco Egypt's income would be computed on a gross-up basis. Craig stated such gross-up would not adversely affect EGPC's interest "since EGPC is entitled to deduct from EGPC's gross income the A.R.E. income taxes of AMOCO paid by EGPC." Leithy placed his initials next to the English version of the above declaration.

A draft of the MCA prepared contemporaneously with the August 4, 1975, letter provides in part:

> In calculating its A.R.E. Income Taxes, EGPC shall be entitled to deduct royalties paid by EGPC to the GOVERNMENT and the A.R.E. Income Taxes of AMOCO [Egypt] paid by EGPC on AMOCO [Egypt]'s behalf.

An internal telex, dated August 26, 1975, from Chiati, states that "In article IV(f) with respect to taxes, EGPC insists on our taking Esso's text as it is, i.e. without amendments".

Article IV(f)(6), specifically, was proposed by EGPC, and had no significance to Amoco Egypt, given Amoco Egypt's understanding that it entitled EGPC to deduct royalties and Amoco Egypt's taxes from taxable income. Craig understood that Article IV(f)(6) entitled EGPC to a deduction from income, and at some point discussed such understanding with Leithy, but Craig never discussed EGPC's taxes in general.

On November 16, 1975, Leithy and Craig initialed the MCA in English on behalf of EGPC and Amoco Egypt, respectively.

Under Article VII of the MCA, Amoco Egypt is entitled to up to 20 percent of the crude oil produced as a reimbursement for the costs of exploration, production, and related operations.[5] EGPC and Amoco Egypt share the remaining 80 percent of production in varying percentages, between 85 and 87 percent for EGPC and 13

---

[5]  Such recovery limit is not related to the computation of Amoco Egypt's Egyptian income taxes with respect to deductible costs.

and 15 percent for Amoco Egypt.  Out of its share of production,
EGPC is obligated under the MCA to pay the ARE a royalty of 15
percent of the total quantity of petroleum produced and saved
from the concession.  Under Article IV(a) of the MCA, Amoco Egypt
is not required to pay any royalty to the ARE on its share of
production.

The English version of Article IV(f) of the MCA provides in
part:

1.    AMOCO [Egypt] shall be subject to Egyptian Income
Tax Laws and shall comply with the requirements of
the A.R.E. Law in particular with respect to
filing returns, assessment of tax, and keeping and
showing of books and records.

*   *   *   *   *   *   *

3.    EGPC shall assume, pay and discharge, in the
name and on behalf of AMOCO [Egypt], AMOCO
[Egypt]'s Egyptian Income Tax out of EGPC's
share of the Crude Oil produced and saved and
not used in operations under Article VII.
All taxes paid by EGPC in the name and on
behalf of AMOCO [Egypt] shall be considered
taxable income to AMOCO [Egypt].

4.    EGPC shall furnish to AMOCO [Egypt] the proper
official receipts evidencing the payment of AMOCO
[Egypt]'s Egyptian Income Tax for each tax year
within two hundred and ten (210) days following
the commencement of the next ensuing tax year.
Such receipts shall be issued by the proper tax
Authorities and shall state the amount and other
particulars customary for such receipts.

5.    As used herein Egyptian Income Tax shall be
inclusive of all income taxes payable in the
A.R.E. (including tax on tax) such as the tax on
income from movable capital and the tax on profits
from commerce and industry and inclusive of taxes

based on income or profits including all dividend, withholding with respect to shareholders and other taxes imposed by the GOVERNMENT of A.R.E. on the distribution of income or profits by AMOCO [Egypt].

6. In calculating its A.R.E. income taxes, EGPC shall be entitled to deduct all royalties paid by EGPC to the GOVERNMENT and AMOCO [Egypt]'s Egyptian Income Taxes paid by EGPC on AMOCO [Egypt]'s behalf.

Article IV(f)(2) defines Amoco Egypt's annual income for Egyptian income tax purposes, which includes the market value of oil received by Amoco Egypt, plus an amount equal to Amoco's Egyptian income tax liability computed in the manner shown in Annex E to the MCA. Annex E, regarding accounting procedures and tax implementing provisions, provides:

It is understood that any A.R.E. income taxes paid by EGPC on AMOCO [Egypt]'s behalf constitute additional income to AMOCO [Egypt], and this additional income is also subject to A.R.E. income tax, that is "grossed-up".

Article IV(f)(6) is identical to Article III(f)(6) of the 1973 Esso agreement and to the version initialed by EGPC and Amoco Egypt on November 16, 1975. It is also identical in substance to the August 4, 1975, draft of the MCA.

Article XXIII(a) of the MCA provides:

Any dispute arising between the GOVERNMENT and the parties with respect to the interpretation, application or execution of this Agreement, shall be referred to the jurisdiction of the appropriate A.R.E. Courts.

Article XXVI of the MCA provides:

The Arabic version of this Agreement shall, before the Courts of A.R.E., be referred to in construing or interpreting this Agreement; provided, however, that in any arbitration pursuant to Article XXIII hereabove between EGPC and AMOCO [Egypt] the English version shall also be used to construe or interpret this Agreement.

Article XXX of the MCA provides:

This Agreement shall not be binding upon any of the parties hereto unless a law is issued by the competent authorities of the Arab Republic of Egypt, authorizing the Minister of Petroleum to sign said Agreement and giving Articles IV * * * of this Agreement full force and effect of law notwithstanding any countervailing governmental enactment, and the Agreement is signed by the GOVERNMENT, EGPC and AMOCO [Egypt].

The Arabic version of the MCA was reviewed by I. Radwan and Mansour for EGPC, and Chiati, Sadek and Aguizy for Amoco Egypt, in December 1975. Article IV(f)(6) of the Arabic version includes the Arabic word "minha", meaning "therefrom", following the Arabic words for "to deduct", "an takhssim". The term "minha" literally means from it or her. The Arabic word for taxes, "daraa'ib", is a feminine noun. The Arabic word for income, "al-dakhl", is a masculine pronoun.

Thereafter, both the English and Arabic versions of the MCA were reviewed and approved by the Egyptian State Council, the Council of Ministers, and the Industry and Motive Power Committee of the People's Assembly, prior to consideration by the People's Assembly.

On February 9, 1976, the People's Assembly passed Law No. 15 of 1976.  Article 1 authorizes the Minister of Petroleum to sign the MCA.  Article 2 gives several articles of the MCA, including Article IV, the force of law prevailing over contrary legislation.

President Sadat signed a decree promulgating Law No. 15 of 1976 on February 19, 1976.  Law No. 15 of 1976 and the MCA were published in the Egyptian Official Gazette on February 21, 1976, in English and Arabic.

The minutes of the People's Assembly session in which Egyptian Law No. 15 of 1976 was considered and approved reflect no discussion of the tax aspects of the MCA.  Nor does a report prepared by the Industry and Motive Power Committee concerning Law No. 15 of 1976 address such aspects.  The report does note that the Egyptian Government expects to receive an additional $2.4 billion from the Amoco Egypt concessions over the next 20 years as a result of converting the 50/50 agreements to the production sharing format.

The MCA in its English and Arabic versions was formally executed by the EGPC, Amoco Egypt, and the Minister of Petroleum, on behalf of the ARE, on February 24, 1976.  The MCA became effective as of July 1, 1975.

1983 MCA Amendments

In 1976, respondent issued Rev. Rul. 76-215, 1976-1 C.B. 194, holding that taxes paid under an Indonesian production sharing agreement were not creditable. On June 12, 1978, respondent issued Rev. Rul. 78-222, 1978-1 C.B. 232, holding that taxes paid under a revised Indonesian production sharing agreement were creditable.

In August 1978, in response to the Indonesian rulings, Amoco decided that the MCA needed to be restructured in certain respects in order to ensure U.S. tax creditability, including requiring Amoco Egypt: (1) To pay its Egyptian income taxes directly, and (2) to compute such taxes on a consolidated basis rather than separately in respect of each concession.

Amoco developed proposed MCA amendments to submit to the U.S. Internal Revenue Service (IRS) for a favorable ruling. The provision in the MCA providing for EGPC's payment of Amoco Egypt's taxes represented a change from the generally applicable Egyptian tax law pursuant to which Amoco Egypt had previously paid its taxes directly and, because of the Indonesian rulings, raised questions as to creditability under U.S. law. The basic approach of the proposed amendments was to provide that Amoco Egypt would be subject to and pay its own taxes under the general tax laws rather than have them paid by EGPC as provided in the

MCA. The MCA provisions relating to EGPC's payment of Amoco Egypt's taxes, including Article IV(f)(6), would be deleted.

Chiati advised Amoco that it would not be an easy matter to pass through the People's Assembly the various amendments to the laws required by Amoco's approach.

Amoco wanted to apply its approach to all other contractors. However, on the assumption that this perhaps would not be feasible, Amoco considered the consequences of only Amoco Egypt's renouncing the MCA provisions and subjecting itself to the general tax laws.

In September 1978, Amoco representatives met with Leithy, the EGPC chairman, and then with Hilal, the Minister of Petroleum, to advise them of the Indonesian rulings and the need to amend Amoco's production sharing agreements in the ARE. Leithy and Hilal indicated a willingness to discuss the matter further when Amoco had a specific proposal to make.

Amoco assembled a group to develop specific proposals for restructuring the agreements and to draft the necessary documents. This group included Rosshirt, Jim Flaherty, an Amoco tax attorney, Charles K. Koepke, the Administrative and Economics Manager for the Middle East region, Richard Rausch, head of Amoco's Planning and Economics Group, and Chiati, an Egyptian attorney and adviser on Egyptian law. Also, Amoco retained Carl A. Nordberg, as outside tax counsel, to advise the company on the

changes that needed to be made to the concession agreements to ensure U.S. tax creditability. Nordberg specializes in international tax matters and assisted in the restructuring of the Indonesian production sharing agreement so that it resulted in a creditable tax.

Amoco developed a proposal whereby the agreements would be amended to provide that Amoco Egypt would pay its Egyptian income taxes directly and by deleting all of the provisions relating to EGPC's payment of Amoco's Egyptian taxes on Amoco's behalf, including Article IV(f)(6) of the MCA. Amoco also proposed the use of a Petroleum Production Incentive Allowance (PPIA), which was a formula under which additional oil would be allocated to Amoco Egypt in order to allow it to pay its Egyptian taxes directly while keeping the net economic interests of Amoco Egypt and the ARE substantially unchanged. Amoco developed the PPIA because EGPC was not willing to alter the existing production split, see supra p. 20, to reflect a gross-up for the taxes to be paid directly by Amoco Egypt. EGPC found an increase in Amoco Egypt's production allowance more appealing for political purposes. Since under the PPIA approach, Article IV(f)(6) would be deleted, its meaning was unimportant to Amoco at this time in connection with the ruling request.

In the course of developing the proposed changes in the MCA, it was understood by Amoco and its advisers that Article IV(f)(6)

of the MCA provided EGPC with a deduction from gross income for royalties and the Egyptian taxes that were paid on Amoco Egypt's behalf.  Such understanding was based variously and cumulatively on the plain language of the English version of the MCA, the lack of knowledge that the Arabic was possibly different than the English, the internal symmetry of the MCA, and the August 4, 1975, letter of principles, supra p. 19.

On September 5, 1979, Amoco submitted a request to the IRS for a ruling on the creditability of Amoco's Egyptian income taxes based on certain proposed changes to the MCA as follows:

1.  Amendment of the MCA to delete all provisions relating to Amoco Egypt's income tax liability, including the provision under which EGPC assumes responsibility for paying Amoco Egypt's tax liability, and to state simply that Amoco Egypt is subject to Egyptian income tax laws and shall comply with those laws.

2.  Addition of the Petroleum Production Incentive Allowance ("PPIA") to reflect the additional economic burden assumed by Amoco Egypt for its own tax liability.

3.  Clarification that Amoco would become directly liable for payment of its income taxes from Amoco's funds.

4.  Provision for the establishment of certain rules to clarify how the Egyptian income tax laws apply to the oil and gas business.

Due to Leithy's refusal, the ruling request did not assume that EGPC would apply the modified tax provisions to non-U.S. oil companies.  This provided an element of doubt to Amoco regarding U.S. creditability.

On September 18, 1979, Amoco sent a copy of the September 5, 1979, ruling request to EGPC.  In February 1980, Amoco requested expeditious treatment of the ruling.  Amoco's chairman wrote the U.S. Secretary of Commerce and the U.S. Secretary of the Treasury, with respect to the ruling request.  On August 5, 1980, Amoco's chairman met with the Secretary and Assistant Secretary of the Treasury to discuss the request and was advised that a favorable ruling would be issued shortly.

In July 1980, Amoco filed a supplementary request, asking for a favorable ruling on the existing MCA, i.e., without the proposed amendments as set forth in the September 5, 1979, request; or, anticipating a negative ruling, for such negative ruling to be applied prospectively for years beginning after the issuance of a favorable ruling on the PPIA approach.  The supplemental request did not address the computation of EGPC's taxes.

On August 7, 1980, the IRS issued a favorable ruling on Amoco's September 5, 1979, request.  A ruling on the supplemental request was issued on August 11, 1981, which did not address the indirect subsidy rules under section 4.901-2(f), Temporary Income Tax Regs, 45 Fed. Reg. 75647, 75653 (Nov. 17, 1980), see <u>infra</u> p. 34.

Amoco was aware that the "lack of a creditable Egyptian income tax could result in reduced corporate earnings on the

order of several hundred million dollars annually in the near future" and that the "ultimate result will be determined by negotiation."

In late September 1980, Amoco sent a team to the ARE to negotiate the changes to the MCA contemplated by the favorable IRS ruling. In an internal meeting with Amoco Egypt, Glen Taylor of Amoco Egypt expressed concern that the proposed amendments had deleted the provision "which allowed EGPC to 'deduct' from its own tax liability all royalties which it pays to the Government and Amoco [Egypt]'s Egyptian income taxes paid by EGPC on Amoco [Egypt]'s behalf." Amoco's U.S. representatives understood the MCA to allow only a deduction from income.

At a meeting on September 28, 1980, Hilal, Minister of Petroleum, informed Amoco that he would be announcing the departure of Leithy as EGPC chairman. Hilal also confirmed EGPC's willingness to amend the MCA, provided he could assure the parliament that the ARE would never be any worse off under the amended agreement. Leithy left EGPC because of political differences with Hilal on how to run EGPC.

With regard to negotiating the amendment of the MCA, the lead EGPC negotiator was Hamed Kaptan, an auditor. Mansour, the EGPC staff attorney, was also involved. Rausch was the lead negotiator for Amoco until August 1981, and Koepke was the lead negotiator from August 1981 until the amendments were concluded

in August 1983. Other Amoco representatives in the negotiations included Flaherty, Chiati, and Dudley.

It was Amoco's understanding, going into the negotiations, that it was necessary only to keep the ARE whole, based in part on Hilal's statement at the September 28, 1980, meeting. At the first negotiating session in late September 1980, however, Kaptan asserted that both the ARE and EGPC should be kept no worse off. Amoco countered that keeping EGPC whole should be taken care of between EGPC and the ETD, and did not concern Amoco.

Because it wanted to be kept whole, EGPC objected to the deletion of Article IV(f)(6), arguing that this provision permitted them to take a credit for the taxes paid on Amoco Egypt's behalf. EGPC asked what Amoco intended to do to compensate EGPC if it lost what it viewed as its right to a credit for Amoco Egypt's taxes. The Amoco negotiators disagreed with EGPC's interpretation of Article IV(f)(6) and expressed the view that the article provided for a deduction from income for the taxes paid on Amoco's behalf. Amoco did not argue the point because it anticipated that Article IV(f)(6) was going to be taken out of the MCA. Amoco did not investigate EGPC's assertion that it had been claiming credits for Amoco Egypt's taxes. At no time during the restructuring negotiations did Amoco discuss with EGPC the basis for EGPC's taking a tax credit.

In the course of discussions, one idea that was raised, but quickly dismissed, was to have a law passed entitling EGPC to a credit for taxes paid directly by Amoco Egypt.  Amoco left the first negotiating session having agreed to look into the U.S. tax consequences of allowing EGPC a tax credit for Egyptian taxes paid directly by Amoco Egypt, by inserting language to such effect into the MCA.  Amoco also considered amending the language of Article IV(f)(6).

Following the September 1980 meetings in the ARE, Amoco officials met with Nordberg, who reiterated to Amoco that Article IV(f)(6) should be deleted from the agreement and, moreover, advised that a continuation of EGPC's credit practice could jeopardize U.S. tax creditability.  Nordberg advised that allowing EGPC a tax credit would severely jeopardize a favorable ruling from the IRS.  The advice was based on Nordberg's analysis of Rev. Rul. 78-258, 1978-1 C.B. 239, and the proposed regulations under section 901, under which, he thought, allowing EGPC a credit would constitute an indirect subsidy.  Amoco accepted Nordberg's advice.  Nordberg advised that it would not jeopardize U.S. creditability if EGPC got relief in a manner not related to the amount of Amoco Egypt's tax payments, including if EGPC were forgiven a fixed fraction of its taxes, or EGPC's royalty obligation were eliminated.

In early November 1980, a second round of negotiations took place between Amoco and EGPC, where Amoco representatives communicated Nordberg's advice to EGPC, that EGPC could not be allowed to credit Amoco Egypt's taxes against its tax liability. EGPC indicated that it understood Amoco's position. However, EGPC continued to indicate the credit practice, and keeping EGPC whole, was an open issue through meetings in December 1980. At a December 18, 1980, negotiating session, EGPC indicated that it would drop the credit issue. It was understood by Amoco that EGPC would deal with the ETD as far as being kept whole, but that EGPC would not arrange with the ETD to take credits for Amoco Egypt's taxes.

In November 1980, temporary regulations under section 901 were released, indicating that it would be permissible for U.S. tax creditability purposes for a foreign national oil company to pay a contractor's taxes. See sec. 4.901-2, Temporary Income Tax Regs., 45 Fed. Reg. 75647, 75648 (Nov. 17, 1980). In light of the temporary regulations, Amoco reviewed the EGPC negotiations and planned for a new IRS ruling request on the existing MCA. Part of Amoco's strategy was to protect its U.S. tax credits claimed for 1979 and 1980.

In a January 1981 negotiation meeting, EGPC indicated that it was attempting to get a reduction in the royalty rate it paid

the Egyptian Government, as compensation for no longer taking tax credits for Amoco Egypt's taxes.

In January 1981, Amoco submitted another ruling request to the IRS seeking a determination that taxes paid by EGPC on Amoco Egypt's behalf under the existing agreements were creditable. Amoco believed that the basic provision whereby Amoco Egypt's taxes were paid by EGPC would pass muster under the temporary regulations and, if so, that it would not be necessary to continue the difficult negotiations on the PPIA approach. In stating the reasons why the Egyptian tax system met the requirements for a creditable tax under section 903, Amoco stated: "No portion of Amoco's tax is refunded to it, nor is any portion of such tax used directly or indirectly to provide a subsidy to Amoco." The computation of EGPC's taxes was not addressed, and Amoco did not indicate that EGPC had claimed a tax credit for taxes paid on behalf of Amoco Egypt.

In February 1981, EGPC formed a new negotiating team that included Mansour. Mansour was more amenable than the previous lead negotiator, Kaptan, to handling the loss of EGPC's right to the credit under Article IV(f)(6) through a reduction in the royalty rate.

In March 1981, Amoco Egypt sent a letter to EGPC to resolve an impasse over a "keep-whole" clause. The clause was requested by EGPC as a means of recovering from Amoco Egypt the difference,

if any, between the taxes it paid and any additional revenue it received under the PPIA provisions. In an attachment to the letter, Amoco Egypt described the status of the negotiations in part as follows:

> At one point EGPC questioned the deletion of the following provision in the Concession Agreements [Article IV(f)(6)] * * * The loss of such credit or more precisely "deductions" said EGPC, is apt to adversely affect its financial position. <u>Clearly the loss of this credit will have no impact whatsoever on Egypt as a whole</u>. As to EGPC, it is possible to offset the loss of above credit by EGPC agreeing with the Government to reduce the royalty paid [by EGPC] to the Government. [Emphasis added.]

By letter dated March 20, 1981, Amoco submitted additional information to the IRS regarding its January 1981 ruling request, in response to specific questions posed by the IRS on two issues. The letter did not address the issue of EGPC's payment of taxes on behalf of Amoco Egypt.

By May 1981, Amoco Egypt was frustrated in failing to reach an agreement with EGPC, with an economic hardship clause being the major obstacle. It recognized, based on EGPC's inconsistent negotiating methods, that further obstacles might include the readdressing of previously discussed issues, including language in the agreements allowing EGPC to credit against its own tax liability tax payments discharging Amoco Egypt's tax liability.

In August 1981, Amoco received a favorable ruling from the IRS on the January 1981 ruling request. With minor reservations, the ruling stated that EGPC's payment of Egyptian income taxes on

behalf of Amoco Egypt would not affect the latter's foreign tax credit. As a consequence of this ruling, the PPIA proposal was abandoned, and Amoco and its outside counsel began drafting revised amending agreements to reflect the minor changes required by the new ruling. Nordberg prepared an initial draft, which left Article IV(f)(6) in the agreement, based on the premise that EGPC would continue to pay Amoco Egypt's taxes and was entitled to receive a deduction from income. Flaherty deleted Article IV(f)(6) from Nordberg's draft based on EGPC's having orally agreed to such deletion in the context of the PPIA negotiations and a general concern regarding EGPC standing by its agreement to discontinue taking a tax credit.

In a letter to EGPC, dated September 21, 1981, Amoco Egypt advised EGPC that it had obtained "an Internal Revenue Service Ruling on a revised approach to amending the Concession Agreements which we believe will satisfy all of EGPC's concerns." Amoco Egypt stated that, under the ruling, EGPC could continue to discharge Amoco's Egyptian tax liability on Amoco Egypt's behalf.

On September 22, 1981, a meeting was held at Amoco's Chicago offices where it was decided that Article IV(f)(6) could be retained in the agreement.[6] Nordberg advised that the most

---

[6] Regarding this meeting, Chiati wrote in a memo to the file: "EGPC's credit for payment of Amoco [Egypt]'s taxes to be left as is." Despite the literal meaning of this sentence, it appears to be merely a shorthand way of saying Article IV(f)(6) was going to
(continued...)

important concern was to make the changes to the MCA simple, and to get them done quickly.  In this light, Nordberg advised that it was not necessary to insist that EGPC change its practice of taking a tax credit for Amoco Egypt's taxes.

Nordberg's advice was based in part on consultations with other lawyers at his firm, including Kevin Dolan and Daniel Horowitz, who had been involved in foreign tax credit issues as employees of the Treasury Department and IRS National Office, respectively.  Based on those consultations and a memorandum prepared by Dolan,[7] Nordberg concluded that, because of EGPC's status as a public authority, the subsidy rule under the Treasury regulations would not be implicated regardless of EGPC's treatment of the tax it paid on behalf of Amoco Egypt.

In a letter to EGPC, dated October 14, 1981, Amoco Egypt presented a proposed amending agreement, wherein it stated:

> The substance of the changes is to provide for the computation of Amoco Egypt's Egyptian income tax liability on the basis of the consolidated income from all concession agreements. EGPC shall continue to discharge Amoco's Egyptian tax liability on its behalf and, contrary to my earlier advice, no change need be made in the provision relating to EGPC's right to deduct such taxes paid on Amoco's behalf in calculation of EGPC's Egyptian income tax liability.

---

[6](...continued)
be left in the agreement as is.  In his testimony, Chiati shows an understanding that EGPC was entitled only to a deduction.

[7]  Dolan's memo concluded that the arrangement is properly analyzed under the direct subsidy rules since EGPC is a governmental entity.

There was no change to Article IV(f)(6) in the proposed amended MCA.

On August 2, 1982, two more ruling requests were submitted to the IRS. Again, the computation of EGPC's taxes was not mentioned.

Negotiations of the amending agreement continued for over a year. During this period, there were no discussions of Article IV(f)(6). In December 1982, Amoco Egypt and EGPC initialed a "Memo of Understanding", which described the agreed changes to the MCA and reflected that no change would be made to Article IV(f)(6). Shortly thereafter, Amoco Egypt and EGPC initialed an amended MCA that retained Article IV(f)(6) without change.

In August 1983, a law was enacted authorizing the Minister of Petroleum to enter into the amended MCA. The promulgation law provided that the provisions of the amended MCA had the force of law and would be in effect by way of exception to the provisions of any contradictory legislation. Article IV(f)(6) was not changed in the final amended MCA signed by the parties in August 1983.

Petitioner's Knowledge as to EGPC's Credit Practice

In March 1980, Amoco Egypt wrote Amoco in the United States, regarding the implementation of a two-tier pricing system, stating in part: "Since taxes paid by EGPC on behalf of contractors are creditable against EGPC's other tax liabilities there also should be no difference in EGPC's total tax bill."

Such letter was prepared by Amoco Egypt's finance manager, Richard Dudley, although it was signed by the president of Amoco Egypt, D. B. Wilkie. On September 16, 1980, Dudley wrote the ETD about the change of EGPC's fiscal year and stated: "Since EGPC pays our taxes and credits such payments against their own taxes, we must furnish EGPC with data on our accrued taxes for the period January 1 to June 30, 1980." Dudley consequently wrote a telex to Amoco in the United States regarding the information requirement, stating "Amoco taxes paid by EGPC are credited against their payment." Dudley had considerable tax-related experience with production sharing agreements, although he had no knowledge of the negotiation of the MCA, and was not experienced with the preparation of Amoco Egypt's tax returns. Dudley's statements in the above correspondence reflected his impressions, rather than his reasoned analysis of the MCA. Dudley had no understanding of the impact of EGPC's treatment of taxes paid on Amoco Egypt's behalf on Amoco's U.S. tax liability.

Respondent's Knowledge as to EGPC's Credit Practice

In early February 1988, respondent was furnished with a statement from the ETD that taxes of contractors, such as Amoco Egypt, were taken as a credit against EGPC's tax liability. Concurrently, respondent obtained an English translation of the Arabic text of a provision identical to Article IV(f)(6).

In April 1988, after respondent advised Nordberg that she had been informed of the EGPC tax credit, Nordberg went to the

ARE and reviewed EGPC's tax returns which reflected that EGPC was claiming such credit, and reported this information to respondent.  This was the first instance in which Amoco informed respondent that EGPC was taking the credit.

On May 11, 1988, EGPC sent a letter to Amoco Egypt confirming that EGPC claimed a credit.  EGPC explained that its method of computing its tax was a combination of general Egyptian income tax principles and special provisions found in the production sharing agreement.  On May 31, 1988, Amoco submitted a memo to respondent, in which it explained EGPC's credit practice as follows:

> It now appears, however, that the Arabic version of Article IV(f)(6) contains some additional words which, according to some translators, provide that EGPC is allowed to deduct from its income taxes the taxes it pays on Amoco Egypt's behalf plus the royalties it pays on its own behalf.  That is, under this interpretation, EGPC is allowed an intragovernmental tax credit for the Amoco Egypt taxes (as well as for the EGPC royalty) that reduces EGPC's tax liability.

The memo further stated an understanding that EGPC had claimed a tax credit for 1979, the year then in issue.

Section 901(i)

In 1986, section 901(i) was added to the Code. Tax Reform Act of 1986, Pub. L. 99-514, sec. 1204(a), 100 Stat. 2085, 2532. Section 901(i) provides:

> (i) Taxes Used to Provide Subsidies.--Any income, war profits, or excess profits tax shall not be treated as a tax for purposes of this title to the extent--

(1) the amount of such tax is used (directly or indirectly) by the country imposing such tax to provide a subsidy by any means to the taxpayer, a related person (within the meaning of section 482), or any party to the transaction or to a related transaction, and

(2) such subsidy is determined (directly or indirectly) by reference to the amount of such tax, or the base used to compute the amount of such tax.

From 1988 to 1990, Amoco engaged in repeated attempts to obtain a technical correction of section 901(i).

Also from 1988 to 1990, Amoco, with help from EGPC, the Petroleum Ministry, and the U.S. Ambassador to the ARE, endeavored to persuade the U.S. Treasury Department and the Congress regarding the status of EGPC as a part of the Egyptian Government and the nonapplication of the indirect subsidy rules to entities like EGPC.

Egyptian Resolution of Credit Issue

On March 20, 1991, Jim Lenahan, assistant general tax counsel of Amoco, consulted Nordberg on whether Amoco should ask the Egyptian Government "to remedy the Egyptian deal either prospectively or retroactively."

On December 24, 1991, Miller & Chevalier, petitioner's counsel in this case, outlined a "program" for obtaining assistance from the Egyptian Government. The program proposed meetings between senior Amoco personnel and senior Egyptian officials, as well as lower-level meetings. The program contemplated convincing EGPC and the Petroleum Ministry to change

EGPC's tax credit prospectively. Petitioner believed it would maximize its chances of obtaining such a change by demonstrating to the Minister of Petroleum that the intent of the parties to the MCA was for EGPC to get a tax deduction, instead of tax credit.

In January 1992, lawyers for Amoco interviewed Craig, former president of Amoco Egypt, and in February 1992, they interviewed Leithy, former chairman of EGPC, with respect to their respective understandings of the purpose and intent of Article IV(f)(6) as written in 1975. They did not seek such information directly from EGPC.

Between February 2 and February 6, 1992, Charles Pitman, Amoco Egypt's incoming president, and Fuller, chairman of the board of Amoco, discussed Amoco's foreign tax credit controversy with Dr. Hamdi El Banbi, the Minister of Petroleum and the former chairman of GUPCO. The purpose of Fuller's presence was, inter alia, to "underscore the seriousness of the dispute" with the IRS.

On February 6, 1992, David Work, the outgoing president of Amoco Egypt, Pitman, Lenahan, and Chiati met with Banbi concerning petitioner's dispute with the IRS. Lenahan told Banbi that other U.S. oil companies were interested in the case and that Amoco was taking the lead. Banbi agreed to help Amoco if he could do so at no cost to the ARE and suggested that Amoco advise EGPC's chairman Dr. Moustafa Shaarawy. Shortly after the

February 6, 1992, meeting, Banbi told Work to let him know if Amoco was not receiving full cooperation from EGPC. Amoco contacted Shaarawy shortly after the February 6, 1992, meeting. On February 10, 1992, Lenahan and Carlson met with EGPC's A. Radwan. Lenahan and Carlson requested EGPC's help to show: (1) That EGPC is part of the Egyptian Government, and (2) that EGPC does not receive a subsidy from the Egyptian Government. On February 11, 1992, Lenahan and Carlson met with A. Radwan again and provided him with an extensive report on the two issues. EGPC expressed that it would fully cooperate.

Amoco did not ask Minister Banbi to consider changing EGPC's tax credit practice until May 13, 1992, after the determination of the ETD, reflected in a letter dated May 2, 1992, that EGPC was not entitled to claim credits for foreign partner taxes. Until May 1992, EGPC had officially taken the position that it was entitled to a tax credit.

In December 1989, Ahmed Ismail, a tax inspector in the Petroleum Section of the Department of Tax on Joint Stock Companies of the ETD, conducted his first audit of EGPC, concerning its 1983-1984 return. He did not challenge EGPC's claimed tax credits for royalties or foreign partner taxes. Such action conformed with the failure to challenge such credits in earlier years.

In an audit report signed November 29, 1990, concerning EGPC's 1984-1985 tax year, Ismail reported that EGPC subtracted

foreign partner taxes and royalty expenses from its income for purposes of its profit/loss statement, but had restored foreign partner taxes to its income on its income tax return.  Ismail, in his audit report, restored the royalty expense to EGPC's income, as EGPC itself had done for foreign partner taxes.  The audit report did not address whether EGPC was entitled to a tax credit for royalties or foreign partner taxes.  An assessment form (Form 19), dated December 27, 1990, for the 1984-1985 tax year does not indicate an allowance of a tax credit.[8]

For the 1985-1986 tax year, also audited by Ismail, a notice of assessment (Form 18), dated December 5, 1991, shows an adjustment in EGPC's income in the amount of foreign partner taxes and royalties paid by EGPC.  The notice does not provide for a tax credit for royalties or foreign partner taxes.

For the 1986-1987 tax year, Ismail prepared an audit report denying EGPC a deduction from income for either royalties or taxes paid on behalf of foreign partners.  Ismail cited Article 114 of Egyptian Law No. 157 of 1981 for the proposition that corporate tax is not a deductible cost.  The notice of assessment for the 1986-1987 year (Form 18) does not provide for a tax credit.

In October 1991, Ismail met for the first time with Ahmed Momtaz, an employee of Amoco Egypt responsible for coordinating

---

[8]  Ismail testified that the credit was disallowed, which is consistent with the absence of the credit on the assessment form.

audit adjustments with EGPC. Ismail inquired as to Momtaz' view of Article IV(f)(6) of the MCA. Momtaz translated the English version into Arabic and expressed his view that Amoco Egypt's taxes should be treated as a cost by EGPC.

As of January 1992, EGPC's tax years up to the June 30, 1980, short year were closed, following ETD audits, appeals to the Internal Committee on challenged positions, and the expiration of the Egyptian statutory period of limitations. Regarding EGPC's payment of taxes on behalf of foreign partners for those years, it was never at issue whether EGPC was entitled to a deduction or a credit for taxes paid. In reports discussing the 1975 and 1976 tax years, and the 1977 and 1978 tax years, the Internal Committee states that, in calculating its income taxes, EGPC is entitled to "deduct therefrom the Egyptian income tax it paid on behalf of Amoco", and allowed EGPC to deduct such amounts from its tax base. There is no discussion of foreign partner taxes in Internal Committee reports concerning the 1979 tax year and the short year ending June 30, 1980. The Internal Committee's review was focused on whether EGPC had substantiated the payment of foreign partner taxes.

Also as of January 1992, notices of assessment for the 1980-1981 to 1982-1983 years had been issued, which had not disallowed EGPC's practice of taking a credit. No final assessment had yet been made for these years.

In an Internal Committee report dated January 19, 1992, concerning the 1980-1981 tax year, there is no discussion of foreign partner taxes. The final assessment for the 1980-1981 year, Forms 3 and 4, dated February 3, 1992, did not allow a credit for royalties or taxes paid on behalf of foreign partners. In another Form 19 concerning the 1980-1981 year, dated April 14, 1992, the ETD served a notice of tax assessment based on the disallowance of a credit to EGPC. This was not a "revised" Form 19.

EGPC objected to the disallowance of credits for the 1980-1981 year.

In January 1992, Ismail prepared a memorandum for the head of the Tax Department for Joint Stock Companies describing EGPC's treatment of royalties and foreign partner taxes, concluding that EGPC's treatment was improper. Ismail discussed the issue with his superiors in the department. The issue was then referred to the ETD's Research Department in February 1992. Ismail subsequently met with personnel from the Research Department, described the adjustments he had made, and provided them with copies of EGPC's tax returns and the MCA.

In Ismail's discussions with the Research Department, only the Arabic text of the MCA was considered. The word "minha" in Article IV(f)(6) was considered and, following Ismail's belief that "minha" referred to the method of calculation, Ismail and

the Research Department concluded that foreign partner taxes and royalties were costs deductible from income.

In April 1992, in memorandums concerning the 1981-1982, 1982-1983, and 1983-1984 years, Ismail confirmed that EGPC was allowed to deduct royalties and foreign partner taxes, as a cost, but not as a credit against taxes.

On April 14, 1992, the ETD issued "revised" notices of assessment (Forms 19), for the 1981-1982 to 1983-1984 tax years, disallowing a credit for royalties and foreign partner taxes.

By letter dated May 2, 1992, the Research Department informed the head of the Tax Department for Joint Stock Companies that a determination had been made, with the approval of the chairman of the ETD, that EGPC was not entitled to a tax credit for royalties and foreign partner taxes. ETD's determination applied to all Egyptian production sharing agreements and to the deductibility of both royalty payments and foreign partner taxes.

On May 6, 1992, Lenahan suggested to Pitman that they brief Banbi as soon as possible in light of the audit controversy. A May 6, 1992, draft of talking points for a meeting with Banbi reflects an intent to discuss the following: (1) The IRS concerns about EGPC taking a credit; (2) the finding that both Craig and Leithy had intended a deduction; (3) Leithy's suggestion that Amoco approach Banbi and request that EGPC change its practice to conform to the intent of Craig and Leithy, and that Leithy intended to contact Banbi directly, on such issue; (4) the

problem of creditability for petroleum investment in Egypt; and (5) that EGPC's practice could be corrected at no cost to the Egyptian Government. A May 7, 1992, draft adds that ETD's audit position that EGPC should take a deduction, as reflected in the May 2, 1992, letter, provides an additional setting for resolving the matter. Lenahan's pre-meeting notes show that he planned to tell Banbi that EGPC's agreement to the ETD audit position would provide an administrative solution to the tax credit problem.

Amoco, represented by Pitman, Chiati, and Lenahan, met with Minister of Petroleum Banbi on May 13, 1992, where they raised all of the main talking points, including ETD's audit dispute with EGPC. Amoco told Banbi that it would be potentially harmful to Amoco in its dispute with respondent if EGPC vigorously contested the issue and wrote position papers and appealed the issue, and Banbi indicated that would not happen. Banbi indicated that he (1) was aware of the ETD determination, (2) had already concluded that EGPC would comply with that determination, (3) already had instructed an EGPC official to quantify the effect of correcting EGPC's prior credit practice, and (4) was prepared to do what was right. Banbi further indicated his preference to find an administrative solution such as that offered by the ETD audit. Banbi also indicated his awareness that the U.S. creditability problem applied to all U.S. companies and that he wanted to remove the cloud of uncertainty regarding foreign tax creditability. Banbi told Amoco to advise other U.S.

petroleum companies that the EGPC tax credit problem would be resolved. Banbi realized that EGPC's tax credit could be changed at no cost to Egypt. Banbi further made it clear that he knew the change would have some unfavorable impact on EGPC and on the Petroleum Ministry, and would have a favorable impact on the Finance Ministry, and that the bonuses of EGPC's top managers would be less, while the bonuses of the top managers at the Finance Ministry would rise.

At the May 13, 1992, meeting, Chiati raised the issue of obtaining an interpretative law approved by the People's Assembly, regarding EGPC's right to a deduction. Banbi quickly dismissed the idea because, while in the end he thought the law would be passed, it would take too long and would subject him to scrutiny and criticism. Banbi preferred an administrative solution, particularly in light of the opportunity presented by the ETD audit.

Chiati also inquired whether EGPC might seek an opinion in the State Council that could overrule the ETD's rejection of EGPC's tax credit position. Banbi initially thought that might occur, but later indicated that EGPC would agree with the ETD and not seek such an opinion.

Near the end of the meeting, Amoco indicated it would be helpful to have official ARE documents showing, inter alia, that the EGPC tax dispute had been resolved in a manner consistent with normal resolution of disputes between different branches of

the ARE. Banbi agreed to provide letters to Amoco to prove the point.

Banbi indicated that he was relying on A. Radwan for help on the details of making the change to taking a deduction in a retroactive manner and met with Banbi after the Amoco representatives had left.

On May 13, 1992, A. Radwan informed Pitman that Banbi had instructed him to work out the change of EGPC's tax credit. A. Radwan told Pitman that EGPC would do its best. Pitman viewed this as a sign that A. Radwan would not give up the credit so easily.

Amoco representatives met with A. Radwan on May 14, 1992, where they made a point of emphasizing that Banbi had given the go-ahead to work out the change to a deduction retroactively. A. Radwan raised several obstacles to Amoco's suggestion that a retroactive change of EGPC's tax credit would be relatively easy to accomplish. It appeared that A. Radwan was trying to create as many obstacles as possible to the suggestion that the retroactive change was relatively easy to accomplish. A. Radwan described Amoco's request for a retroactive change as a "new request". A. Radwan reminded Amoco that it had previously requested EGPC's help to show only two points: (1) That EGPC is part of the Egyptian Government, and (2) that EGPC does not receive a subsidy from the Government. When Lenahan asked A. Radwan point blank whether he agreed with the ruling of the

ETD concluding that the EGPC credit should be changed to a deduction, A. Radwan responded no, but that he may change his mind.

On May 18, 1992, Pitman sent a letter to Banbi setting forth his understanding of the issues resolved at the May 13, 1992, meeting, including that EGPC's credit practice would be changed retroactively, and asking for confirmation of such. By letter dated May 21, 1992, Banbi replied to Pitman's letter, confirming its contents and that he had issued instructions to the concerned staff in EGPC to draft suitable proposals to that end.

Also by letter of May 21, 1992, Banbi wrote the Minister of Finance concerning the dispute between EGPC and the ETD, and the dispute between the IRS and U.S. oil companies operating in Egypt. Stating that such readjustments would have no bearing on the total amounts to be channeled to the Finance Ministry, Banbi requested the approval of the Minister of Finance of a procedure whereby EGPC's past payments of surplus to the Finance Ministry would be set off against its adjusted tax liability for prior years. A copy of Banbi's letter was forwarded to the head of the Department of Tax on Joint Stock Companies. The ETD responded to Banbi's letter by memo dated May 26, 1992, stating that EGPC had theretofore disputed the ETD's determination that it was not entitled to a tax credit.

On May 24, 1992, A. Radwan requested that Amoco help EGPC sort everything out with the Finance Ministry. Between June and

December of 1992, Amoco provided the Egyptian officials with accounting advice on the financial arrangements and numerous drafts of agreements and letters between the Ministers of Petroleum and Finance.  Amoco attempted to remain apart from the decision-making aspects of the resolution of the issue, but was nevertheless involved in the process.

On August 1, 1992, the Minister of Finance responded to Banbi's May 21, 1992, letter, confirming that EGPC should have deducted foreign partner taxes from income and not from its taxes.  The Minister further stated that a retroactive accounting settlement between taxes and surplus would not be feasible and that instead the Finance Ministry would use EGPC's future surplus to pay the tax differentials for the previous years up to June 30, 1992, successively.

By letter dated August 6, 1992, Banbi agreed to the principles in the August 1, 1992, letter from the Minister of Finance and asked that instructions be given regarding the immediate implementation of those principles.  On August 11, 1992, the Minister of Finance forwarded Banbi's letter to the head of the Funding Sector of the Finance Ministry, and to the chairman of the ETD.  The necessary steps were subsequently taken to implement the agreement of the Ministers of Finance and Petroleum as to disallowing EGPC's tax credit claims for royalties and foreign partner taxes for all open years, beginning with EGPC's tax year ended June 30, 1981.

At a meeting held August 24, 1992, regarding EGPC's 1980-1981 tax year, the Internal Committee of the ETD determined that EGPC was not entitled to a credit for taxes paid on behalf of foreign partners, but was allowed to deduct such amount from its revenues in computing taxable income. The Internal Committee cited both the report issued by the Research Department and the letter from Minister of Petroleum Banbi agreeing to its conclusion. Such determination also applied to the 1981-1982 and 1982-1983 tax years.

On September 3, 1992, Pitman met separately with Banbi and Shaarawy, where he stated Amoco's concern that EGPC do the right thing procedurally in making up the tax delinquency. Pitman stated it would be incorrect for EGPC to simply have the Funding Sector transfer surplus paid to the ETD and that the correct approach would be for EGPC to write separate checks to the Funding Sector and to the ETD. Banbi replied that EGPC would do the right thing procedurally and that he was prepared to lose his job as minister as a result. Banbi also stated that, as minister, he could issue a ministerial decree fixing the salaries and bonuses of EGPC personnel so that they would not be affected by lower surpluses.

In November 1992, at the request of petitioner's counsel, the ETD issued a certificate confirming that it had reached a final determination on the EGPC credit issue, as of May 1992, and concluding that EGPC had erroneously deducted Amoco Egypt's tax

payments from EGPC's tax liability rather than from income and that EGPC should pay all tax differentials for all open years. Further, it was stated that EGPC would comply with the tax department's determination both prospectively and retroactively, and that by December 1992 it was expected that EGPC would have completed payment of the tax differential for the 1980-1981 tax year, and that payment for later years would follow a final assessment by the tax department.

Also in November 1992, EGPC and Amoco Egypt, with the approval of the Minister of Petroleum, entered into an agreement whereby EGPC agreed to document for Amoco Egypt its compliance with the ETD's determination concerning foreign partner taxes for both prospective and retroactive purposes.

EGPC's deficiencies for the tax years ending June 30, 1981, June 30, 1982, and June 30, 1983, have been paid.  Payments were made by check and posted to EGPC's tax file (No. 440/6).

In its Egyptian tax return for the taxable year ended June 30, 1993, EGPC deducted foreign partner taxes in computing taxable income and did not claim a credit for such amount.

1993 and 1994 Production Sharing Agreements

In 1993, Amoco Egypt, EGPC and the Egyptian Government finalized a new production sharing agreement for the East Shukheir Marine area.  Under this 1993 agreement, EGPC assumed the obligation to pay Amoco Egypt's Egyptian income taxes on

behalf of Amoco Egypt. Article III(g)(6) of the agreement provides:

> 6. In calculating its A.R.E. income taxes, EGPC shall be entitled to deduct all royalties paid by EGPC to the Government and [Amoco Egypt's] Egyptian income taxes paid by EGPC on [Amoco Egypt's] behalf.

The Arabic version of the above provision does not include the word "minha" as did the MCA at issue herein. The word "minha" was not used at Amoco Egypt's request.

In a 1994 production sharing agreement entered into between EGPC and Mobil, the English text includes a provision comparable to Article IV(f)(6) herein, with the proviso, "but EGPC shall not credit directly or indirectly CONTRACTOR'S Egyptian income taxes against EGPC's Egyptian income taxes."

Notice of Deficiency

In calculating allowable foreign tax credits for the taxable years 1979, 1980, 1981, and 1982, petitioner included Egyptian income taxes paid on behalf of Amoco Egypt by EGPC, pursuant to the MCA and other concession agreements between Amoco Egypt, EGPC, and the ARE, in the following amounts:

| Year | Amount |
|------|--------|
| 1979 | $304,015,893 |
| 1980 | 498,086,280 |
| 1981 | 557,873,428 |
| 1982 | 453,586,679 |

Amoco also included these amounts in its U.S. gross income. On October 12, 1984, Amoco timely filed amended consolidated

corporate income tax returns on behalf of itself and its domestic subsidiaries for the taxable years ended December 31, 1979, December 31, 1980, December 31, 1981, and December 31, 1982, with the District Director, Chicago, Illinois, reflecting Amoco's timely election to: (1) Apply the provisions of the 1983 foreign tax credit regulations retroactively to the years at issue, and (2) apply the "safe harbor" method of determining allowable foreign tax credits with respect to Egyptian taxes.

Applying the "safe harbor" method in its amended returns, petitioner treated portions of the Egyptian income taxes reported on its original returns as creditable taxes. The remainder was deducted in computing taxable income. The amounts reported on petitioner's amended returns are summarized as follows:

| Year | Credit Claimed | Deducted | Total |
|------|----------------|----------|-------|
| 1979 | $215,414,631 | $ 88,601,262 | $304,015,893 |
| 1980 | 459,881,927 | 38,204,353 | 498,086,280 |
| 1981 | 383,993,639 | 173,879,789 | 557,873,428 |
| 1982 | 308,490,746 | 145,095,933 | 453,586,679 |

Egyptian income taxes claimed as foreign tax credits by Amoco in 1979 were not utilized to reduce Amoco's 1979 U.S. tax liability and were carried forward to 1980 and subsequent tax years.

On June 18, 1992, respondent issued a statutory notice of deficiency to petitioner for the 1980, 1981, and 1982 tax years. In the notice of deficiency, respondent determined that Amoco Egypt's Egyptian income taxes had not been paid within the

meaning of section 901 and the regulations thereunder.
Respondent disallowed all of petitioner's foreign tax credits
relating to Egyptian income taxes for the 1980, 1981, and 1982
tax years, as well as the Egyptian foreign tax credit
carryforward from 1979.  Respondent also decreased petitioner's
gross income by amounts corresponding to the foreign tax credits
claimed for the 1980, 1981, and 1982 tax years.  Petitioner
timely filed a petition with this Court on September 11, 1992,
contesting the proposed deficiencies in tax, and claiming an
overpayment of tax plus interest in respect of other items.[9]

OPINION

Section 901 allows a domestic corporation a credit against
its Federal income tax in the amount of any taxes paid or accrued
during the taxable years to any foreign country.  See American
Chicle Co. v. United States, 316 U.S. 450 (1942).  The purpose of
the credit is to reduce international double taxation.  Id. at
452.  Whether petitioner is entitled to foreign tax credits is to
be determined by applying principles of domestic tax law.  United
States v. Goodyear Tire & Rubber Co., 493 U.S. 132 (1989);
Phillips Petroleum Co. v. Commissioner, 104 T.C. 256, 295 (1995).
In applying this mandate, however, we look first to the law of

---

[9]  See supra note 2.

the foreign state in order to determine the nature of the obligations and rights which form the basis of the claim of a foreign tax credit. Cf. Phillips Petroleum Co. v. Commissioner, supra; H. H. Robertson Co. v. Commissioner, 8 T.C. 1333 (1947), affd. 176 F.2d 704 (3d Cir. 1949). In so doing, we note that the parties are in agreement that the Egyptian tax involved herein constitutes an "income tax" within the meaning of section 901. See also Rev. Rul. 82-119, 1982-1 C.B. 105.

The framework for disposition of this case is the merger concession agreement (MCA) among Amoco Egypt Oil Company (Amoco Egypt), a wholly owned subsidiary of petitioner, the Egyptian General Petroleum Corporation (EGPC), an Egyptian public authority, and the Arab Republic of Egypt (ARE).

There is no dispute between the parties that, absent the particular circumstances involved herein, petitioner would be entitled to the claimed credit in respect of the amounts of such tax claimed to have been paid to the ARE by EGPC on Amoco Egypt's behalf out of EGPC's share of the oil production. Additionally, we note that respondent does not contend that any portion of such amounts represents a disguised payment for Amoco Egypt's undertakings under the MCA.

The issues herein are grounded on the effect to be given to Article IV(f)(6) of the MCA and its interpretation and application by EGPC. Article IV(f)(6) provides in its English version:

In calculating its A.R.E. income taxes, EGPC shall be entitled to deduct all royalties paid by EGPC to the GOVERNMENT and Amoco's Egyptian Income Taxes paid by EGPC on Amoco [Egypt]'s behalf.

The Arabic version of Article IV(f)(6) is the same except for the addition of the Arabic equivalent of "therefrom" after the phrase "to deduct".

During the years at issue, EGPC interpreted Article IV(f)(6) as authorizing it to credit the Egyptian income taxes of Amoco Egypt against its Egyptian income taxes rather than to deduct such taxes in calculating its income.

The determination of petitioner's entitlement to a foreign tax credit under section 901 depends upon the resolution of the following issues:

(1)  Whether Article IV(f)(6) authorizes EGPC to take a credit for Amoco Egypt's Egyptian income taxes paid by EGPC. Analysis of this issue involves consideration of whether the MCA is a contract or a law of the ARE, including consideration of the impact of the variation between the English and Arabic versions of Article IV(f)(6), and, in either case, consideration of the intent of the parties and the extent to which such intent should be taken into account.

(2)  The impact of the position of the Egyptian Tax Department over the years in respect of the taking of the credit by EGPC, and particularly its action in 1992, disapproving such

credit.  Implicated in this issue is the application of the "act of state" doctrine.

(3)  Whether the taking of the credit by EGPC for Amoco Egypt's taxes should be treated as a tax exemption, refund, or subsidy so as to require the conclusion that the Egyptian income taxes were not paid within the meaning of section 901.  Analysis of this issue involves, among other considerations, the question whether EGPC, whose surplus was paid annually to the ARE, should be treated as an integral part of, or a separate entity from, the Government of the ARE and, in this context, whether the characterization of a subsidy can apply where the funds involved are, at all times, funds of the ARE.

(4)  Depending on our resolution of the foregoing issues, the impact on petitioner's foreign tax credits of the difference in exchange rates between the time of the payments by EGPC during the years in issue and its payment of its back taxes after the disallowance in 1992 of the credits it took for Amoco Egypt's taxes.

One additional comment is necessary before turning to a detailed consideration of the above-described issues.  Throughout these proceedings, respondent has sought to capitalize on the alleged variations over the years in petitioner's and its counsel's approach to the situation involved herein and on the activities of representatives or officers of petitioner and Amoco Egypt, including their counsel.  Respondent has expressly

renounced any assertion of conspiracy or like characterization in respect of the action of the ETD in 1992 and has confined her assertions to "orchestration" of such action by petitioner and Amoco Egypt and less than full disclosure of facts to respondent in connection with petitioner's requests for rulings. Our review of the record has satisfied us that respondent's charges and innuendos are without merit and that the actions of petitioner, Amoco Egypt, and their counsel represent simply efforts, expended with skill and professional competence and propriety, to cope with a troublesome situation. In any event, such activities neither help nor hinder the accomplishment of the task before us (namely to reach our own conclusions as to the issues involved), except to the extent that such activities should properly be taken into account in determining the intent of the parties. Under these circumstances, we will make no further comment on the above-described assertions of respondent.

The initial dispute between the parties involves the question whether, under Egyptian law, EGPC was entitled to claim a credit against its income taxes for the payments made on account of Amoco Egypt's income taxes. Respondent asserts that Article IV(f)(6) of the MCA unambiguously provides for such a credit, that the Arabic version of the MCA has the force of law so that there is no room for interpretation to take into account the intent of the parties to the MCA, and that, in any event, the parties to the MCA intended that EGPC would be entitled to such a

credit under Article IV(f)(6). Petitioner counters with the assertion that, properly interpreted, both the English and Arabic versions of the MCA and the income tax law of the ARE only entitled EGPC to claim a deduction for the income tax which Amoco Egypt was obligated to pay.

The English version of Article IV(f)(6) of the MCA provides: "In calculating its A.R.E. income taxes, EGPC shall be entitled to deduct all royalties paid by EGPC to the GOVERNMENT and Amoco [Egypt]'s Egyptian Income Taxes paid by EGPC on Amoco [Egypt]'s behalf." Looking only at this version of Article IV(f)(6), we think that a strong argument can be made that it provides EGPC with a deduction of Amoco Egypt's tax from income and not a credit against EGPC's income tax. Such an interpretation would accord with the use of the word "deduction" in Annex E of the MCA which provides that Amoco Egypt's taxes are to be computed on the "gross income of AMOCO less the costs and deductions * * *". Such an interpretation would also reflect the intention of the parties, see infra pp. 66-70. Moreover, it would conform to the general understanding, under the U.S. tax context, that the word "deduct" means to subtract from gross income. See, e.g., sec. 62(a) (defining adjusted gross income as "gross income minus the following deductions"); Black's Law Dictionary at 413 (6th ed. 1990). Before adopting this conclusion, however, we need to deal with the Arabic version of Article IV(f)(6).

The Arabic version of Article IV(f)(6) added the word "minha" after the word "deduct" (which appears as "takhssim").

The parties do not see eye to eye on the English translation of the Arabic version.  Petitioner contends that the correct translation of the Arabic version of Article IV(f)(6) is:

In calculating its A.R.E. income taxes, EGPC shall be entitled to deduct therefrom all royalties paid by EGPC to the GOVERNMENT and AMOCO [Egypt]'s Egyptian Income Taxes paid by EGPC on AMOCO [Egypt]'s behalf.

Respondent contends the correct translation is:

When EGPC undertakes to calculate income taxes imposed on EGPC in the A.R.E., EGPC is entitled to subtract therefrom (or, to credit against them) all of the royalties EGPC has paid to the government and Amoco [Egypt]'s Egyptian income taxes which EGPC has paid on behalf of Amoco [Egypt].

Respondent concedes that the phrase in parentheses, "or, to credit against them", is not in the original.

The two relevant differences between the translations are: (1) Whether the Arabic word "takhssim" means "deduct" or "subtract"; and (2) the meaning to be attributed to the inclusion of the Arabic word "minha", meaning "therefrom", following "takhssim".

Regarding the first difference, petitioner's expert argues that "takhssim" translates only to "deduct" and that the Arabic word for "subtract" is "yatrah", which is not present. Respondent's expert argues that "takhssim" is a general term meaning "subtract", which needs direction by a prepositional phrase regarding from where to subtract.  We think that this is a

tweedledum-tweedledee situation; "subtract" and "deduct" are synonymous. Webster's New Dictionary of Synonyms at 793 (1968).

The more critical difference rests on the significance of the inclusion of the term "minha", meaning "therefrom".

Petitioner argues that "minha" refers not to EGPC's taxes as finally determined but to the process of calculating EGPC's taxes articulated in the opening clause of Article IV(f)(6), which is a feminine concept in Arabic. Petitioner goes on to assert that if we should conclude that the language of Article IV(f)(6) does not unambiguously support its position then we should resolve any ambiguity by looking to the intent of the parties.

Respondent argues that, because the Arabic word for taxes is feminine, and because "minha" means from it or her, the provision unambiguously instructs EGPC to deduct Amoco Egypt's taxes from EGPC's own taxes. Respondent goes on to assert that Article IV(f)(6) is inconsistent with the generally applicable principles of deduction from income under Egyptian tax law. This being the case, there is no basis for looking beyond the language of Article IV(f)(6) to the intent of the parties since Article II of the promulgation law, Egyptian Law No. 15 of 1976, accorded the force of law to the MCA and operates as an exception to other Egyptian laws, with the result that it should be strictly interpreted.

We find it unnecessary to dwell upon the allegedly inescapable conclusion that, because the MCA has the force of

law, Article IV(f)(6) provides a credit of Amoco Egypt's taxes against EGPC's taxes rather than a deduction from income. We are not persuaded that the gender analysis is as compelling as respondent seeks to have us conclude. We think the juxtaposition of the word "minha" in Article IV(f)(6) does not require that it be attributed to the word "takhssim" (taxes) but that there at least is a question as to the determination of from what the deduction of taxes should be taken. In this connection, we think it relevant that respondent's expert testified, with respect to the new 1993 agreement, that the omission of the word "minha" did not change the meaning of the tax provision, and that even without the word, EGPC would be entitled to a credit. In effect, this line of reasoning makes the presence of the term "minha" irrelevant, so that the English and Arabic versions are virtually identical. Such analysis undermines and is in direct conflict with the evidence that, in 1993, Amoco Egypt, EGPC, and the ARE intended to remove any doubt that EGPC get a deduction. It is clear that, given the awareness of the problem and the stakes involved, careful attention was paid in 1993 to ensuring that there was no question that EGPC was not granted a right to a credit. Indeed, this phase of testimony of respondent's expert tends to weaken the impact of his advocacy of the significance of the word "minha" in the 1975 MCA involved herein.

In short, we are satisfied that the mandate of the Arabic version of Article IV(f)(6) is not so clear as to preclude us

from taking the English version into account[10] and examining the intent of the parties as an aid to interpretation.  In so stating, we note that, in a 1984 case, Judgment of Aug. 26, 1984 (Agypetco v. Minister of Petroleum), Ct. Admin. Justice, Egyptian State Council,  the Administrative Court of the Egyptian State Council, in describing a concession agreement between EGPC, the Minister of Petroleum and a private contractor, stated that the agreement provided that the provisions of the agreement have the force of law, and shall be in force notwithstanding the provisions of any legislation contrary thereto.  Notwithstanding that statement, the court considered both the intent of the parties and the customary practice in the petroleum industry in rendering its opinion.

We see no purpose to be served by regurgitating the evidence as to who said what to whom at the time of the original negotiations in 1975 or at the time of the subsequent discussions relative to changes in the MCA during the 1980's.  Those details have been set forth at length in our findings of fact.

---

[10]  Under Article XXIII of the MCA, any dispute between the ARE and EGPC or Amoco Egypt is to be referred to the courts of the ARE.  Before the courts of the ARE, Article XXVI provides that the Arabic version shall be referred to in construing or interpreting the MCA.

In the event of a dispute between Amoco Egypt and EGPC, Article XXIII provides the matter is to be settled by arbitration.  In any such arbitration, Article XXVI provides that the Arabic version, and also the English version, shall be used to construe or interpret the MCA.

Nevertheless, it is important to note that the MCA negotiations were conducted in English and that an English version of the MCA was the direct product of those negotiations. Moreover, we think it appropriate to address specifically the question of the impact of the Esso and Mobil agreements. Respondent seeks to derive comfort from the facts that those agreements had been concluded by the time of the MCA negotiations and that the language of Article IV(f)(6) of the MCA was derived from, and identical to, that contained in the Esso agreement. In the Arabic version of the Esso agreement, it appears the term "minha" was inserted in the final stages of the translation process. Mefferd, the most senior Esso representative who was familiar with the Arabic version, did not notice and was not made aware of the addition of the term "minha", prior to entering into the agreement. There is nothing in the record indicating which party inserted the term "minha" into the agreement, and the purpose for so doing. By way of contrast, before reaching its final form, Article IV(f)(6) was considered thoroughly by Amoco Egypt and its impact was the subject of discussions among the negotiators for Amoco Egypt and EGPC. In view of the foregoing, we think that, despite the identity of phrasing of Article IV(f)(6), the Esso and Mobil agreements do not impact the intent of the parties to the MCA involved herein.

Based upon our evaluation of the entire record herein, including the testimony of the witnesses whom we saw and heard

and the arguments of the parties as to the credibility of that testimony, we conclude the following in respect of the intention of the parties at the time the MCA was concluded in 1975:[11]

(1)  Amoco Egypt clearly intended that Article IV(f)(6) was designed to confirm EGPC's right under general Egyptian tax law to deduct from its income the amount of taxes it was paying on Amoco Egypt's behalf and not to authorize a credit which would constitute an exception to such law.

(2)  EGPC was uncertain of its right, under the general Egyptian income tax law, to deduct taxes paid on behalf of another from its income and, as far as it was concerned, the purpose of Article IV(f)(6) was to confirm that right.  Perhaps EGPC may have had an unexpressed view that the insertion of the word "minha" in the Arabic version which followed by rote the Esso and Mobil agreements provided a basis for obtaining a credit rather than a deduction.  Certainly, its post-1975 actions in claiming that credit lends some support to such a view although it clearly does not provide legal blessing of its correctness.

(3)  With respect to the Egyptian Government, we find no discernible intent as to the meaning of Article IV(f)(6).  In the

---

[11]  The most persuasive single item of evidence on the intent of Amoco Egypt and EGPC is the letter, dated August 4, 1975, signed by Craig, president of Amoco Egypt, and initialed by Leithy, chairman of EGPC, which clearly restates that EGPC is to deduct Amoco Egypt's taxes from EGPC's income.  We are not impressed with respondent's attacks on this letter and Craig's supporting testimony.

Egyptian Government's various reviews of the MCA, there is no discussion of the computation of taxes.

Respondent argues that intent can be found in the Egyptian Government's review of the 1973 Mobil agreement. Respondent refers to a report to the Egyptian State Council, in which it was concluded that the provision, identical to Article IV(f)(6), in effect put Mobil on equal footing with a party who enjoyed a tax exemption. Respondent argues that, by this conclusion, the Government intended Mobil, and later Amoco, to enjoy a tax exemption. We are not persuaded. The report merely makes a common-sense observation, similar to one that could be made about the U.S. taxpayer in Example (3) of section 1.901-2(f)(2)(ii), Income Tax Regs.[12] Furthermore, there is no evidence that the report was considered by the State Council or by the Egyptian legislature, the People's Assembly. The authorization laws for both the Esso and Mobil agreements were promulgated by presidential decree, without being enacted by the People's Assembly.

We find support for our conclusions that the MCA would have been more explicit in allowing EGPC a credit if that was so intended. There appears to have been no provision in the general

---

[12] In Example (3) of sec. 1.901-2(f)(2)(ii), Income Tax Regs., the U.S. taxpayer's foreign tax obligation is assumed by the government of the foreign country imposing the tax liability. The example recognizes that the foreign tax is paid, although there is no direct out-of-pocket payment from the U.S. taxpayer. See infra p. 80.

Egyptian tax law allowing a credit for taxes paid.  By contrast,
when EGPC was exempted from certain customs, export and stamp
duties, the exemptions were clearly listed in the enabling
legislation, and the exemptions were discussed in the legislative
history.

Further, we note that, in the 50/50 agreements, where a
credit was intended, the parties used appropriate language, which
is not found in the MCA.

Finally, we are satisfied that the post-1975 events did not
constitute a ratification by Amoco Egypt of any purported right
of EGPC to take the credit for Amoco Egypt's taxes, assuming for
purposes of discussion that such ratification would have created
a right which EGPC did not have as a matter of Egyptian law, an
assumption of doubtful validity since the MCA agreements had the
force of law which would make Article IV(f)(6) inviolate in
respect of changes in meaning by the parties.

We recognize that, in 1980, Amoco learned that EGPC was
claiming a credit by virtue of Article IV(f)(6).  EGPC's basis
for taking such a credit was never discussed, and the proper
interpretation remained in dispute when the parties entered into
the amended MCA in 1983.  Amoco did not agree that EGPC was
entitled to a credit, but did not press the issue at the time,
first, because it planned on deleting the provision from the MCA,
and later, because Amoco thought, based on EGPC's governmental
status (see infra pp. 81-82), it was irrelevant for U.S. foreign

tax credit purposes whether EGPC took a credit. Respondent's assertion of ratification confuses knowledge (which Amoco and Amoco Egypt had) with approval (which they did not give).

Respondent emphasizes that, in Amoco's ruling requests, Amoco never stated that EGPC was claiming a credit for taxes paid on Amoco Egypt's behalf. We are not persuaded that, given its view as to the governmental status of EGPC, Amoco was obligated to detail the factual basis for its assertion that no subsidy was involved, see infra p. 91. In any event, any failure on the part of Amoco to discharge any such obligation would simply be with respect to Amoco's ability to rely on those rulings. Neither the rulings nor the facts on which they were premised are relevant to our determination.

Of greater significance than the foregoing analysis of the meaning of Article IV(f)(6) and the relevant Egyptian tax law is the ruling of the ETD to which we now turn our attention.

From 1975 to 1992, EGPC claimed a credit each year against its income taxes for Amoco Egypt's income taxes, and its actions were not challenged by the ETD for the taxable years through June 30, 1980. In 1992, after reviewing the MCA, the ETD determined that EGPC was not entitled to such credit. EGPC, at the urging, and with the approval, of the Minister of Petroleum, acquiesced in the ETD determination and agreed to pay back taxes, calculated on the basis of a deduction of Amoco Egypt's taxes.

Petitioner argues that we can rely on the ETD determination. Respondent counters with several arguments. First, respondent argues that, prior to 1992, it was settled law that Article IV(f)(6) provided EGPC with a foreign tax credit. In support of this argument, respondent points to the fact that, in 1991, the GPC, a subsidiary of EGPC, prevailed before the Arbitral Tribunal in a dispute with the Finance Ministry and the ETD over whether a provision similar to Article IV(f)(6) entitled the GPC to a credit for taxes paid on behalf of another party. However, the decision of the tribunal focused on whether GPC in fact paid taxes on behalf of the foreign partner and did not deal with the question of whether GPC was entitled to a deduction or a credit for such taxes. Leaving aside whether the Arbitral Tribunal's decision constitutes settled Egyptian law, it is obvious that such decision does not operate to preclude the ETD from challenging EGPC's credit practice.

As a second point, based on her assertion that settled Egyptian law provided for a credit under Article IV(f)(6), respondent argues that "Article IV(f)(6) is a statutory provision which cannot be amended except by the enactment of another law by the People's Assembly and the President", and that neither the ETD determination nor the December 1992 agreement between Amoco Egypt and EGPC is sufficient to amend the statutory text of Article IV(f)(6). We think it obvious from our earlier analysis that this argument is without merit. The ETD determination and

the later agreement did not seek to amend the law.  The ETD merely sought an interpretation of how Article IV(f)(6), as originally written, should be applied.  Additionally, we reject respondent's attempt to have us reject the ETD determination because of prior actions by the Internal Committee in respect of EGPC taxes where the credit was not disallowed.  There is no evidence that the credit issue was ever addressed prior to 1992. Moreover, the ETD was not bound by prior inaction any more than respondent would be in respect of such inaction.  See Lozoff v. United States, 392 F.2d 875 (7th Cir. 1968), affg. 266 F.Supp. 966 (E.D. Wis. 1967); Thomas v. Commissioner, 92 T.C. 206, 226-227 (1989).

Respondent seeks to undermine the effect of the ETD determination by arguing that EGPC could have successfully disputed that determination under substantive and procedural Egyptian law, and that EGPC would have done so but for petitioner's efforts to persuade Banbi, the Minister of Petroleum, to prevent EGPC from doing so.  Whether EGPC could have successfully challenged the ETD determination is unclear, because there was no precedent focused on the credit versus deduction issue at the time.  In this connection, we note that in 1993, the Refute Committee, on an appeal from the Internal Committee, supra p. 5, upheld the ETD's interpretation of a provision like Article IV(f)(6) in an agreement between GPC and another foreign oil company.  The Refute Committee relied on the

ETD's May 2, 1992, determination, discussed above, supra p. 46, and the agreement of the Minister of Petroleum, and of EGPC, to abide by the ETD determination. Regarding its own interpretation of the tax provision, the Refute Committee held that it means that GPC could deduct royalties and foreign partner taxes to arrive at taxable income. In taking this position, the Refute Committee made no reference to the earlier decision of the Arbitral Tribunal, see supra p. 71, a further indication that the Arbitral Tribunal did not reach the credit versus deduction issue.

We further reject respondent's attempt to discredit the ETD determination by suggesting that it was motivated by national interest considerations relating to Egypt's ability to continue to exploit its oil resources. We do not doubt that such considerations entered the picture, given the fact that similar concerns have historically been brought to bear on the U.S. Treasury Department and the Congress in connection with substantive positions regarding the taxation of revenues derived by U.S. taxpayers from international oil sources. See, e.g., Hearings before a Subcommittee of the Committee on Government Operations of the House of Representatives, 95th Cong., 1st Sess., pp. 315, 442, 452-453 (1977). In any event, we perceive no reason for us to delve into the motives of a foreign government in connection with its tax determinations to any greater extent than we would do so in connection with such

determination by our own government, at least where there is no evidence of fraud or corruption, which is the case herein.  See Raheja v. Commissioner, 725 F.2d 64, 66 (7th Cir. 1984), affg. T.C. Memo. 1981-690; Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327 (1974); cf. W. S. Kirkpatrick & Co. v. Environmental Tectonics Corp. Intl., 493 U.S. 400 (1989).

Under the foregoing circumstances, we find it unnecessary to delve into the question whether the ETD determination approved by the Ministers of Petroleum and Finance, should, as petitioner argues, be accorded conclusive effect under the act of state doctrine.  See W. S. Kirkpatrick & Co. v. Environmental Tectonics Corp. Intl., supra.[13]

One incidental consequence of the ETD determination needs to be mentioned.  The ETD determination could not affect the taxable periods of EGPC prior to that ending June 30, 1981, because those periods were barred by the applicable Egyptian statutory period of limitations.  Some of those periods are contained in the taxable years of Amoco involved herein.  Respondent argues that the credits for Amoco Egypt's taxes taken by EGPC in respect of those periods should not be affected by the ETD determination. We disagree.  The expiration of the period of limitations does not substantively legitimatize the barred action; it simply reflects an inability to enforce the obligation that would

---

[13]  See also Norwest Corp v. Commissioner, T.C. Memo. 1992-282, affd. 69 F.3d 1404 (8th Cir. 1995).

otherwise exist.  Thus, we conclude that the ETD determination is applicable to all the years involved herein.

Our conclusion that Article IV(f)(6) does not provide a credit of Amoco Egypt's income taxes against EGPC's income taxes disposes of respondent's argument that Article IV(f)(6) constituted a de jure exemption from tax to Amoco Egypt which would deprive it of the foreign tax credit claimed herein.  Amoco Egypt was subjected to Egyptian income tax by Article IV(f)(1), and our findings of fact show:  (1) Amoco Egypt filed Egyptian income tax returns; (2) pursuant to Article IV(f)(3) of the MCA, EGPC agreed to pay Amoco Egypt's Egyptian taxes; (3) EGPC paid such taxes to the Egyptian Tax Department on a timely basis; (4) those payments were posted to Amoco Egypt's tax file number; and (5) Amoco Egypt has official receipts from the ETD evidencing the payments made on behalf of Amoco Egypt.  Furthermore, petitioner has satisfied the substantiation requirements of section 905(b). Respondent argues, based on her contrary interpretation of Article IV(f)(6) that, as a result of EGPC's later failure to dispute the 1992 ETD determination, its payments pursuant to that determination were voluntary, and the compulsory tax provisions of section 1.901-2(e)(5), Income Tax Regs., have not been satisfied.  Under the foregoing circumstances, this argument falls by the wayside.

Our analysis, and the conclusions we have thus far reached, are not, however, dispositive of the foreign tax credit issue

involved herein. We are still left with questions stemming from the fact that, whether or not authorized by Article IV(f)(6), EGPC credited Amoco Egypt's income taxes paid by it against its income taxes. These issues relate to the assertion by respondent that such action on EGPC's part constituted a refund or subsidy which should deprive Amoco Egypt of its claimed foreign tax credit. Arguably, our disposition of these issues in favor of petitioner could have obviated our lengthy analysis of the proper interpretation of Article IV(f)(6). However, we decided to set forth such analysis, not only because the parties extensively argued the issue of such interpretation but because we concluded that such analysis would provide useful background for resolution of the issues that still remain. Moreover, we note that even though the credit was not, at any time, proper under Article IV(f)(6), EGPC's action in taking the credit for periods prior to the period ending June 30, 1980, and the running of the period of limitations would require us, to that extent, to deal with such action as a separate matter. We now turn to the refund and subsidy issues.

With respect to the existence of a refund, section 1.901-2(e), Income Tax Regs., provides in pertinent part as follows:

> (1) In general. Credit is allowed * * * for the amount of income tax * * * that is paid to a foreign country by the taxpayer. * * *

> (2) Refunds and credits--(i) In general. An amount is not tax paid to a foreign country to the extent that it is reasonably certain that the amount

will be refunded, credited, rebated, abated, or
forgiven.  * * *

Petitioner argues that this regulation is inapplicable
because it contains no indirect refund rule, and because a refund
must be authorized by the foreign government.  Respondent argues
that, because the entire amount of Amoco Egypt's tax was claimed
as a credit by EGPC, there was a refund.  Respondent reasons that
because "paid by" as used in section 1.901-2(f)(2), Income Tax
Regs., infra p. 80, is defined as meaning "paid or accrued by or
on behalf of" in section 1.901-2(g)(1), Income Tax Regs., section
1.901-2(e)(2), Income Tax Regs., applies to EGPC.

Respondent's position rests, in the first instance, on her
position that the credit taken by EGPC was authorized by Article
IV(f)(6) of the MCA.  Our rejection of that position creates a
situation where it could hardly be said that it was "reasonably
certain" that any amount of Amoco Egypt taxes would be refunded,
etc.  In any event, such a credit could not have been considered
a refund, etc., to Amoco Egypt.  There is no question that Amoco
Egypt was subject to Egyptian income tax, and those taxes were,
at least initially, paid.  The credit was against EGPC's taxes,
and no part of that credit inured to Amoco Egypt.

Steel Improvement & Forge Co. v. Commissioner, 36 T.C. 265
(1961), revd. on other grounds 314 F.2d 96 (6th Cir. 1963),
relied on by respondent, is clearly distinguishable.  In that
case, the U.S. taxpayer claimed foreign tax credits for taxes

deemed paid under section 131(f) of the Internal Revenue Code of 1939, the predecessor to section 902, with respect to a dividend from a Canadian corporation of which it owned more than 10 percent. Some time after the U.S. taxpayer had sold its stock in the corporation, the Canadian tax authorities refunded the Canadian corporation's tax payments. We held the U.S. taxpayer was not entitled to a credit because the taxes deemed to have been paid by the U.S. taxpayer were deemed to have been refunded to the U.S. taxpayer. In the instant case, there is no question the taxes paid on behalf of Amoco Egypt were not refunded to Amoco Egypt.

Similar reasoning disposes of respondent's attempt to support her position as to the existence of a refund by analogizing Example (2) of section 1.901-2(e)(2)(ii), Income Tax Regs., which addresses the situation where a U.S. taxpayer, A, is entitled to an investment credit and a credit for charitable contributions in country X. The example finds that the amount of tax paid by A is A's initial income tax liability less the amount of the investment credit and credit for charitable contributions. The example is inapplicable because it involved a refund directly to the U.S. taxpayer.

In our view, section 1.901-2(e)(2), Income Tax Regs., applies only if the refund is made to or for the account of the U.S. taxpayer claiming credit for the foreign tax. The absence of a refund to Amoco Egypt leaves us with the question to which

we now turn our attention:  whether the credits which EGPC in fact took for Amoco Egypt's taxes can, whether or not authorized by Article IV(f)(6), be considered a subsidy to Amoco Egypt.

Several regulations are implicated in considering the subsidy question.  Section 1.901-2(e)(3), Income Tax Regs., provides in part:

> (3) Subsidies--(i) General rule.  An amount is not an amount of income tax paid or accrued by a taxpayer to a foreign country to the extent that--
>
> (A) The amount is used, directly or indirectly, by the country to provide a subsidy by any means (such as through a refund or credit) to the taxpayer; and
>
> (B) The subsidy is determined, directly or indirectly, by reference to the amount of income tax, or the base used to compute the income tax, imposed by the country on the taxpayer.
>
> (ii) Indirect subsidies. A foreign country is considered to provide a subsidy to a taxpayer if the country provides a subsidy to another person that--
>
> (A) Owns or controls, directly or indirectly, the taxpayer or is owned or controlled, directly or indirectly, by the taxpayer or by the same persons that own or control, directly or indirectly, the taxpayer, or
>
> (B) Engages in a transaction with the taxpayer, but only if the subsidy received by such other person is determined, directly or indirectly, by reference to the amount of income tax, or the base used to compute the income tax, imposed by the country on the taxpayer with respect to such transaction.

Section 1.901-2(f), Income Tax Regs., provides in pertinent part:

> (f)  Taxpayer--(1)  In general.  The person by whom tax is considered paid for purposes of sections

901 and 903 is the person on whom foreign law imposes legal liability for such tax, even if another person (e.g., a withholding agent) remits such tax.   * * *

     (2)  Party undertaking tax obligation as part of transaction--(i)  In general.  Tax is considered paid by the taxpayer even if another party to a direct or indirect transaction with the taxpayer agrees, as a part of the transaction, to assume the taxpayer's foreign tax liability.  The rules of the foregoing sentence apply notwithstanding anything to the contrary in paragraph (e)(3) of this section.  See § 1.901-2A for additional rules regarding dual capacity taxpayers.

     (ii)  Examples.  The provisions of paragraphs (f)(1) and (f)(2)(i) of this section may be illustrated by the following examples:

               *    *    *    *    *    *    *

     Example (3).  Country X imposes a tax called the "country X income tax."  A, a United States person engaged in construction activities in country X, is subject to that tax.  Country X has contracted with A for A to construct a naval base.  A is a dual capacity taxpayer (as defined in paragraph (a)(2)(ii)(A) of this section) and, in accordance with paragraphs (a)(1) and (c)(1) of § 1.901-2A, A has established that the country X income tax as applied to dual capacity persons and the country X income tax as applied to persons other than dual capacity persons together constitute a single levy.  A has also established that that levy is an income tax within the meaning of paragraph (a)(1) of this section.  Pursuant to the terms of the contract, country X has agreed to assume any country X tax liability that A may incur with respect to A's income from the contract.  For federal income tax purposes, A's income from the contract includes the amount of tax liability that is imposed by country X on A with respect to its income from the contract and that is assumed by country X; and for purposes of section 901 the amount of such tax liability assumed by country X is considered to be paid by A.  By reason of paragraph (f)(2)(i) of this section, country X is not considered to provide a subsidy, within the meaning of paragraph (e)(3) of this section, to A.

Section 1.901-2(g)(2), Income Tax Regs., provides:

(2) The term "foreign country" means any foreign state, any possession of the United States, and any political subdivision of any foreign state or of any possession of the United States. * * *

Initially, we note that our reasoning in respect of the existence of a refund disposes of any question of a direct subsidy within the meaning of section 1.901-2(e)(3)(i), Income Tax Regs. Indeed, respondent does not contend that the credit constituted a direct subsidy. Rather, she has focused on the existence of an indirect subsidy.

At the outset, we note that the existence of an indirect subsidy does not depend upon finding that the U.S. taxpayer derived an actual economic benefit. Norwest Corp. v. Commissioner, 69 F.3d 1404 (8th Cir. 1995), affg. T.C. Memo. 1992-282; see also Continental Illinois Corp. v. Commissioner, 998 F.2d 513, 519-520 (7th Cir. 1993), affg. in part and revg. in part T.C. Memo. 1991-66, affg. T.C. Memo. 1989-636, and affg. in part and revg. in part T.C. Memo. 1988-318. We note, however, that such a principle does not mean that no person involved in the transaction need derive any benefit. In fact, the parties agree that the key question is whether EGPC benefitted from the credits of Amoco Egypt's taxes which it took against its own income taxes. Petitioner argues that EGPC, although a separate legal entity, should be considered part of the Egyptian Government and that, as a result, EGPC is not "another person" within the meaning of section 1.901-2(e)(3)(ii), Income Tax

Regs., and Amoco Egypt is entitled to the benefit of Example (3) of section 1.901-2(f)(2)(ii), Income Tax Regs. Petitioner further argues that EGPC derived no benefit from the credits because it was required annually to remit its surplus to the Egyptian Finance Ministry. Respondent argues that EGPC is a separate legal entity which should not be equated to the Egyptian Government and that Example (3) therefore has no bearing on the issue before us and that, as a result, EGPC is "another person" within the meaning of section 1.901-2(e)(3)(ii), Income Tax Regs. Respondent further argues that the benefit EGPC derived from the credits for Amoco Egypt's income taxes is not negated by the requirement that EGPC transfer its surplus annually to the Egyptian Government. Consequently, respondent concludes that Amoco Egypt received an indirect subsidy with the result that the foreign tax credits claimed by petitioner for the Egyptian income taxes of Amoco Egypt should not be allowed.

We first discuss EGPC's status.

Pursuant to Egyptian Law No. 20 of 1976, EGPC "is a Public Authority endowed with an independent juristic personality, engaged in developing and properly utilizing the petroleum wealth and in supplying the country's requirements of the various petroleum products." It is wholly owned and controlled by the Egyptian Government. Upon EGPC's dissolution, all of its assets revert to the Egyptian Government.

EGPC is affiliated with the Petroleum Ministry.  It is governed by a board of directors, the chairman of which is appointed by decree of the President of the ARE, and the members of which are appointed by decree of the Prime Minister of the ARE on the recommendation of the Minister of Petroleum and Mineral Resources.  Resolutions of the EGPC Board of Directors are forwarded to the Minister of Petroleum for ratification.  He is empowered to amend or cancel such resolutions.  The chairman of EGPC is empowered to furnish data and information to the Petroleum Ministry and State bodies.

EGPC's funds are obtained from the State's shares in certain public sector companies, its share of joint ventures with foreign partners, and funds allocated by the government.

Subject to the provisions of Egyptian Law No. 53 of 1973 regarding the State budget, EGPC has an independent budget prepared in the same manner as a commercial budget.  EGPC's funds are considered "privately owned State funds."  Except for amounts set aside in reserve accounts, EGPC's after-tax surplus is remitted annually to the public treasury.  The treasury in turn bears the burden of deficit subsidies.  EGPC has historically been an important source of funds for the Egyptian Government.  EGPC is exempt from a variety of taxes and duties but not from income taxes.

We compare the foregoing elements with those elements in the decided cases where the courts have equated a separate legal entity to the government of which it was a part.

In Cherry Cotton Mills v. United States, 327 U.S. 536 (1946), the Supreme Court held that, where a party brought a claim for tax refund in the Court of Claims, the Reconstruction Finance Corporation (RFC) could bring a counterclaim for debts owed under the statute authorizing counterclaims "on the part of the Government of the United States".  Describing the RFC, the Court stated:

> Its Directors are appointed by the President and confirmed by the Senate; its activities are all aimed at accomplishing a public purpose; all of its money comes from the Government; its profits, if any, go to the Government; its losses the Government must bear. That the Congress chose to call it a corporation does not alter its characteristics so as to make it something other than what it actually is, an agency selected by Government to accomplish purely governmental purposes.  * * * [Id. at 539.]

In First Natl. City Bank v. Banco Para El Comercio, 462 U.S. 611 (1983), the Supreme Court allowed Citibank to apply a setoff of the value of its assets seized by the Cuban Government, against amounts sought by Bancec, a Cuban Government owned bank, from Citibank.  The Court found that the Cuban Government supplied all the capital and owned all the stock of Bancec. Bancec's stated purpose was to contribute to and collaborate with the international trade policy of the Government.  Bancec was empowered to act as the Government's exclusive agent in foreign

trade. The Cuban treasury received all of Bancec's profits, after deduction for capital reserves. Delegates from Cuban governmental ministries governed and managed Bancec, and its president was also Minister of State. The Court applied equitable principles of domestic and international law, focusing in part on the fact that denying the right of setoff would have benefitted only the Cuban Government, as the owner of Bancec. The separate legal status of Bancec was specifically considered and disregarded. Id. at 630 (quoting from Bangor Punta Operations, Inc. v. Bangor & Aroostook R. Co., 417 U.S. 703, 713 (1974)).

In Lebron v. National R.R. Passenger Corp., 513 U.S. ___, 115 S.Ct. 961 (1995), the Supreme Court considered the question whether the National Railroad Passenger Corp., commonly known as Amtrak, is a U.S. Government entity for First Amendment purposes. Describing Amtrak as a Government-created and -controlled corporation, the Court decided that it was. Specifically, the Court focused on two factors: Amtrak was created by a special statute, explicitly for the furtherance of Federal governmental goals; and six of its eight directors were appointed by the President of the United States with the advice and consent of the Senate.

In Vial v. Commissioner, 15 T.C. 403 (1950), this Court determined that the employees of the Corporacion de Fomento de la Produccion (Fomento) were employees of the Chilean Government,

whose compensation was exempt from tax under former section 22(b)(8) of the Internal Revenue Code of 1939. We held that, although Fomento was created as a separate entity by law, it was not a corporation as understood in our legal system, and in fact was part of the Government. Relevant facts that we took into account included that Fomento had no stockholders or members; its governing body was fixed by law; the members of its governing council were ex-officio or were appointed by the legislative or executive branch of the Government; its operations were closely regulated by law and subject to the supervision and approval of Government departments and officers; its purposes and activities were of a governmental nature; it was created by a public law; its head was a cabinet member and its activities were closely coordinated with his department; and it was supported in large part by taxes. We compared Fomento's employees to those of the U.S. Maritime Commission, or to the U.S. Reconstruction Finance Corporation, whose employees were regarded as Government employees.

In In re Investigation of World Arrangements, 13 F.R.D. 280 (D.D.C. 1952), the District Court for the District of Columbia stated that, in determining whether or not a given corporation is an instrumentality of its government, the object and purpose of the corporation were most relevant. The court found that a corporation acquired in 1914, to insure a proper supply of petroleum, crude oil, and other products for the British fleet,

was indistinguishable from the Government of Great Britain.  Id. at 290-291.

In State of Michigan v. United States, 40 F.3d 817 (6th Cir. 1994), the question was whether the investment income of the Michigan Education Trust was exempt from Federal income tax under section 115(i) which provided that "gross income does not include income derived from any public utility or the exercise of any essential governmental functions and accruing to a State or any political subdivision thereof".  The trust was a public "quasi-corporation" established to help parents provide for their children's college education by receiving and investing advance payments.  The trust had a board of directors which was authorized to enter into contracts on behalf of the State; the State treasurer was an ex officio member of the board whose members were appointed by the governor and confirmed by the Michigan senate; the trust was "within" the treasury department, although it acted independently; assets of the trust were not considered State money, common cash, or State revenue although such assets could be pooled with pension funds and other investments of the State and invested by State employees; the Michigan auditor general was responsible for auditing the books of the trust and the trust was required to submit annual reports to the governor and the State legislature.  Finding that the provision of education was an essential State function, and after analyzing all the facts and circumstances, the Court of Appeals

held that the trust was part of the State government and that its investment income was excludable under section 115(i).

We recognize that each of the foregoing cases involves different circumstances so that it can be argued that each case is distinguishable. However, we think the most significant single element is that in none of them did the court feel compelled to reach a different conclusion because a separate legal entity was involved, the factor upon which respondent heavily relies. Nor are we persuaded by respondent's efforts to find support for her position in the application of the commercial activity exception to the sovereign immunity of a foreign state under 28 U.S.C. section 1603 (1988). The Egyptian Government is not a party to this proceeding so that the issue of sovereign immunity is not involved. Similarly, we are not impressed with respondent's reliance on Qantas Airways Ltd. v. United States, 62 F.3d 385 (Fed. Cir. 1995),[14] which held that the plaintiff was not entitled to be treated as part of the Government of Australia under section 1.892-1(b), Income Tax Regs.,[15] dealing with the exemption of income of foreign

_____

[14] See also Rev. Rul. 87-6, 1987-1 C.B. 179.

[15] A foreign government is defined in sec. 1.892-1(b), Income Tax Regs., as follows:

> (b) Foreign government defined--(1) Classes of a foreign government. For purposes of this section, a foreign government consists only of integral parts or controlled entities of a foreign sovereign to the
> (continued...)

governments from Federal income tax.  The Court of Appeals

reasoned that the specific exception which the regulations set

forth was a permissible exercise of regulatory authority and

that, since Qantas was clearly within the terms of the exception,

it could not escape from that exception by claiming it was

entitled to the benefit of the broad general category of a

foreign government out of which the specific exception to the

exemption was carved.  It does not follow from that conclusion

that, absent the specific exception, Qantas would have been

denied "foreign government" status.  In fact, it is the absence

of that exception in the provision of the regulations containing

Example (3) of section 1.901-2(f)(2)(ii), Income Tax Regs., which

provides the critical difference in the instant case.  Compare

---

[15](...continued)
     extent not engaged in commercial activities in the
United States.
                    *   *   *   *   *   *   *
          (3)  Controlled entity.  An entity which is
     separate in form from a foreign sovereign or otherwise
     constitutes a separate juridical entity is a controlled
     entity if it satisfies the following requirements:
          (i)  It is wholly owned and controlled by a
     foreign sovereign directly or indirectly through one or
     more controlled entities;
          (ii)  It is organized under the laws of the
     foreign sovereign by which owned;
          (iii)  Its net earnings are credited to its own
     account or to other accounts of the foreign sovereign,
     with no portion of its income inuring to the benefit of
     any private person; and
          (iv)  Its assets vest in the foreign sovereign
     upon dissolution.

our subsequent discussion of the effect of Example (4) of the regulations under section 901(i), infra pp. 93-95.

It cannot be gainsaid that exploitation of mineral reserves is a significant governmental function. Such being the case and applying the analysis and results of the foregoing cases, we are satisfied that EGPC should be included within the meaning of the term "foreign country" under section 1.901-2(e)(3)(ii) and (g)(2), Income Tax Regs., and Example (3), supra at 80.

We are still left with the question whether Example (3), supra, applies to the instant situation so as to justify the conclusion that the credits taken by EGPC did not constitute an indirect subsidy to Amoco Egypt. The parties have devoted considerable attention to the issue whether the application of Example (3) effectively eliminates the payment requirement. Petitioner argues that Example (3) substitutes a "considered paid" standard making the actual transfer of funds irrelevant. Respondent counters with the argument that such a "considered paid" construction would emasculate the implementation of foreign tax credit provisions and consequently should not be adopted. The parties have also parted company on whether a conclusion that Article IV(f)(6) did not authorize EGPC to take a credit for the Egyptian income taxes of Amoco Egypt is determinative of the availability of the foreign tax credit claimed herein. Petitioner urges that it should not be subjected to the loss of the foreign tax credit for such taxes because of EGPC's

unauthorized action.  Respondent counters that the critical fact is that EGPC took the credit and that whether such action was or was not authorized is irrelevant.

As to the issue in respect of authorization, we note that EGPC in fact took the credit in the pre-June 1980 years and that collection based upon a disallowance of such action by the ETD would have been barred by the period of limitations.  Although, as we have pointed out, see supra p. 74, the running of the statute of limitations does not constitute approval of EGPC's action, it is the equivalent to authorization in substantive result.  This circumstance raises the issue of an authorized credit constituting a subsidy.

We find it unnecessary to resolve the differences between the parties as to these two issues, i.e., payment[16] or authorization, because of our conclusion in respect of the application of Example (3), particularly in light of the last sentence of the example specifically exempting from the subsidy rules a transaction which complies with its terms.

Respondent points to the reference to Example (3) in Continental Illinois Corp. v. Commissioner, T.C. Memo. 1991-66, affd. in part, revd. in part 998 F.2d 513 (7th Cir. 1993).  In that case, we cursorily dismissed Example (3) as inapplicable.

---

[16]  We note that, as our findings of fact show, EGPC in fact paid Egyptian income taxes of Amoco Egypt, and they were specifically credited to the latter's tax account by the ETD.

Since that case turned on the absence of a legal liability for the foreign withholding tax on the part of the withholding agent and the U.S. taxpayer as well, id. T.C. Memo. 1991-66 at n. 46, the inapplicability of Example (3) was obvious. Certainly the case offers no support for respondent's position herein where there clearly was a legal liability on the part of Amoco Egypt and the assumption of that liability by EGPC.

Respondent's reliance on Nissho Iwai American Corp. v. Commissioner, 89 T.C. 765 (1987), is misplaced. In Nissho, a U.S. taxpayer had engaged in a net loan transaction with a private borrower in Brazil, whereby the borrower agreed to pay interest at a certain rate net of any Brazilian withholding taxes. Simultaneous with remittance of the tax by the borrower, the borrower received a subsidy from the Brazilian Government based on the amount of the tax paid. The Court applied the indirect subsidy rule in the temporary regulations, section 4.901-2(f)(3)(ii), Temporary Income Tax Regs., 45 Fed. Reg. 75653-75654 (Nov. 17, 1980), which it held was reasonable, and denied foreign tax credits to the taxpayer for the amount of tax which was credited to the Brazilian borrower.

The holding in Nissho is based upon the finding that the borrower received the subsidy by virtue of the refund of the withheld tax. The borrower was a private party, and thus there was no question it obtained a benefit, so that it does not aid us in our determination herein. Continental Illinois Corp. v.

Commissioner, 998 F.2d 513 (7th Cir. 1993), affg. in part and revg. in part T.C. Memo. 1991-66, affg. T.C. Memo. 1989-636, and affg. in part and revg. in part T.C. Memo. 1988-318, and Norwest Corp. v. Commissioner, T.C. Memo. 1992-282, affd. 69 F.3d 1404 (8th Cir. 1995), are inapplicable for the same reasons.

Respondent's reliance on the regulations under section 901(i), and the background material of those regulations, is also misplaced. Section 901(i) was added to the Code in 1986, to codify the subsidy rules in section 1.901-2(e)(3), Income Tax Regs. See H. Conf. Rept. 99-841 (1986), 1986-3 C.B. (Vol. 4) 1, 593; S. Rept. 99-313 (1986), 1986-3 C.B. (Vol. 3) 1, 325; H. Rept. 99-426 (1985), 1986-3 C.B. (Vol. 2) 1, 352.

The background material, cited by respondent, provides:

> Special treatment for government (or government-owned) entities also was rejected because it would create the potential for a credit to be claimed for a tax nominally paid by or on behalf of a U.S. person when the substance of the transaction with a government entity was to grant a tax holiday to the U.S. taxpayer. This is especially true in the case of a transaction with a government entity that pays taxes: where a tax holiday for the U.S. taxpayer is intended, the government entity could simply assume a tax liability that was nominally borne by the U.S. person and receive a tax credit against its own liability in the amount of the tax nominally paid on the U.S. person's behalf. * * * [T.D. 8372, 1991-2 C.B. 338.]

Example (4) of section 1.901-2(e)(3)(iv), Income Tax Regs. (1991), discusses a situation very similar to the one herein, providing that a credit to a State petroleum authority for a portion of the income taxes paid by it on behalf of a U.S.

taxpayer is a subsidy, and that the U.S. taxpayer is not entitled to a foreign tax credit for the amount of the subsidy.[17] Section 901(i), as well as the regulations thereunder, are applicable only to foreign taxes paid or accrued in taxable years beginning after December 31, 1986. Tax Reform Act of 1986, Pub. L. 99-514, sec. 1204(a), 100 Stat. 2085, 2532; sec. 1.901-2(e)(3)(v), Income Tax Regs. (1991). We need not decide whether petitioner would be entitled to foreign tax credit for foreign taxes paid or accrued after December 31, 1986. See T.D. 8372, 1991-2 C.B. at 340. We note, however, that the focus of the background material seems to confirm concern on respondent's part that prior law did not

---

[17] Sec. 1.901-2(e)(3)(iv) Example (4), Income Tax Regs. (1991), provides:

> Example 4. (i) B, a U.S. corporation, is engaged in the production of oil and gas in Country X pursuant to a production sharing agreement between B, Country X, and the state petroleum authority of Country X. The agreement is approved and enacted into law by the Legislature of Country X. Both B and the petroleum authority are subject to the Country X income tax. Each entity files an annual income tax return and pays, to the tax authority of Country X, the amount of income tax due on its annual income. B is a dual capacity taxpayer as defined in § 1.901-2(a)(2)(ii)(A). Country X has agreed to return to the petroleum authority one-half of the income taxes paid by B by allowing it a credit in calculating its own tax liability to Country X.

> (ii) The petroleum authority is a party to a transaction with B and the amount returned by Country X to the petroleum authority is determined by reference to the amount of the tax imposed on B. Therefore, the amount returned is a subsidy as described in this paragraph (e)(3) and one-half the tax imposed on B is not an amount of income tax paid or accrued.

disallow foreign tax credits in certain situations where a government owned entity assumed a U.S. taxpayer's foreign tax liability.  In this connection, it is at least arguable that just as the presence of a specific exception in the regulations in Qantas Airways Ltd. v. United States, supra, saved the day for respondent, its absence produces the opposite result herein.  The reasoning of the Court of Appeals in State of Michigan v. United States, supra, which reflects an unwillingness to carve out an exception to a general statutory provision, in the absence of evidence of specific intent to that effect, lends support to this view.  Compare Larson v. Commissioner, 66 T.C. 159, 185 (1976), where we applied regulations, establishing criteria for determining whether an organization was a partnership or a corporation, as they were written but recognized that respondent might have prevailed if the regulatory power had been exercised to its full extent.

Respondent insists that Example (3) was intended to be confined to the establishment of an equivalence between gross transactions (where the U.S. taxpayer receives the income and is liable for and pays the foreign income tax directly) and net transactions (where the U.S. taxpayer receives the income net of the taxes otherwise owed to the foreign government).  Respondent urges us to recognize that the application of Example (3) to the situation herein goes beyond the net transaction situation.  Respondent's position is based on the premise that EGPC should

not be equated with the Egyptian Government.  Given our holding to the contrary, it follows that respondent's argument should be and is rejected.  Indeed, having concluded that EGPC was part of the Egyptian Government, a finding of a subsidy would mean that one can subsidize one self.  In so stating, we do not imply that respondent is necessarily precluded from treating, by regulation, entities such as EGPC as separate from the foreign government and therefore "another person" for purposes of determining the existence of a subsidy.

Thus, respondent may well have salvaged its position in respect of Example (3) by Example (4) under the section 901(i) regulations although there is still a residual confusion because of the presence of the two examples in different regulatory provisions.  Compare sec. 1.901-2(f)(2)(ii), Example (3), Income Tax Regs., with sec. 1.901-2(e)(3)(iv) Example (4).  See Blessing & Pistillo, "Final Regulations on the Denial of the Foreign Tax Credit by Reason of Certain Subsidiaries," Tax Mgmt. Intl. J. p. 78 (Feb. 14, 1992).  Such confusion has been a characteristic of the turbulent history of the foreign tax credit, particularly as applied to oil companies such as petitioner herein.  See Isenbergh, "The Foreign Tax Credit:  Royalties, Subsidies, and Creditable Taxes," 39 Tax L. Rev. 227, 247-269 (1984); 1 Isenbergh, International Taxation 495-529 (1990).

The long and the short of the matter is that respondent seeks to equate what might have been with what was in the taxable

years before us.  This we will not do.  We hold that the instant case is governed by Example (3) and that, by virtue of the last sentence thereof, the subsidy rule of section 1.901-2(e)(3), Income Tax Regs., does not apply.

Given our conclusion that there was no subsidy, we need not address the question whether, if Example (3) did not apply and EGPC were treated as "another person" under section 1.901-2(e)(3)(ii), Income Tax Regs., see supra p. 81, EGPC's obligation to transfer its surplus annually to the Finance Ministry (which also received Amoco Egypt's taxes paid by EGPC) in and of itself negated any benefit to EGPC and therefore precluded a finding of a subsidy.  Similarly, we need not address the question whether the potentially different impact of a credit versus a deduction on the bonuses of EGPC employees would be sufficient to warrant a finding of an indirect subsidy to Amoco Egypt.  Finally, our disposition makes it unnecessary for us to deal with the impact on petitioner's foreign tax credit of the difference in exchange rates between the time of the payments by EGPC during the years in issue and its payment of back taxes in 1992.

In view of the fact that there are other issues to be resolved in this case,

> An appropriate order will be issued
> disposing of the foreign tax credit
> issue.